# Supreme Court of Florida

———————

No. SC12-2468
———————

**TIMOTHY W. FLETCHER**,
Appellant,

vs.

**STATE OF FLORIDA**,
Appellee.

[June 25, 2015]

PER CURIAM.

Timothy W. Fletcher was convicted of the first-degree murder of Helen Googe, two counts of grand theft of a motor vehicle, home-invasion robbery, two counts of burglary, and escape. Fletcher appeals his convictions and the sentence of death imposed by the trial court for the murder. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons that follow, we affirm Fletcher's convictions and the death sentence.

## FACTS

On April 14 and 15, 2009, Timothy Fletcher was lawfully in custody at the Putnam County Jail. On the evening of April 14, 2009, and into the early morning

hours of April 15, 2009, Fletcher and his cellmate, Doni Ray Brown, escaped their jail cell pursuant to a previously-discussed plan. Following their eventual re-arrest, Fletcher was interrogated by a detective with the Putnam County Sheriff's Office and an investigator with the State Attorney's Office. During the interrogation, Fletcher recounted the details of the escape and subsequent crimes.

Fletcher explained that on his return from a court hearing on April 2, 2009, he removed a car jack from the jail transportation vehicle, which he concealed in his pants. Nearly two weeks later, on April 14, 2009, after another trip to and from the courthouse, he appropriated the handle for the jack in the same manner. Fletcher explained they executed the escape because he had just been sentenced to ten years' incarceration.[1]

That evening, Fletcher and Brown used the jack and jack handle to pry the toilet away from the wall of their cell, which created a hole through which they could escape. Just after the 2 a.m. cell check, Fletcher and Brown escaped through the hole. They then crawled under a fence, climbed over another fence, and through a gap in a third fence. This brought them to a field next to the jail, which they crossed to reach the highway.

---

1. Fletcher had pled guilty to two counts of burglary of a dwelling and two counts of burglary of a structure or conveyance. He was sentenced to ten years' incarceration for the counts of burglary of a dwelling, and five years' incarceration for the counts of burglary of a structure or conveyance, with the sentences to run concurrently.

They searched for a vehicle at various properties along the highway. First, they located a Z71 pickup truck. After breaking the window, he and Brown entered the vehicle, but Fletcher was unsuccessful as he attempted to start the engine. They searched for a second vehicle and located an unlocked van. However, they were also unable to start that vehicle, so they searched for a third vehicle. They discovered an unlocked Ford pickup truck with the keys in it in a fenced-in yard of a business. Brown struck the gate with the pickup and knocked it down.

As they had previously planned, Fletcher and Brown drove to the house of Helen Googe, the ex-wife of Fletcher's grandfather, because it was the closest place where he and Brown believed they could acquire money. Fletcher believed that Googe kept money in a safe at her house, and he had knowledge of her financial status.

At this point during his post-arrest statement, Fletcher provided varying accounts of subsequent events. In his initial account, Fletcher asserted that Googe voluntarily admitted him into the house, and Brown followed. Fletcher described altercations between Brown and Googe that ultimately led to Googe's death. He asserted that, other than one open-handed slap, he was either absent from the room during the altercations or nothing more than a passive bystander. However, Fletcher renounced this version of events after a detective informed him that

fingernail scrapings had been collected from Googe to test for DNA evidence. The officer observed that Fletcher had scratch marks on his hands and arms, whereas Brown did not, and asked Fletcher if there was any reason why his DNA would be found under Googe's fingernails. Fletcher responded that it should not be, but also stated that he had held Googe down at one point. The detective asked when this occurred, and Fletcher responded, "I really don't even want to tell you everything that happened, to be honest with you." After some discussion, Fletcher admitted, "I'll be honest with you, I kind of lied to you a little bit," and then presented a different version of the events that transpired at Googe's home. This second description matched the description provided by Brown, except with the roles reversed—both Fletcher and Brown asserted that the other committed the actual strangulation of Googe.

Fletcher confessed that he and Brown entered the house through a firewood door that provided an opening to pass wood into the house from the outside. Fletcher was aware that Googe had firearms on the walls of her house; while in jail, he and Brown discussed using a gun to scare and rob Googe. After they entered the house, Fletcher removed an unloaded revolver from the wall above the bathroom door and gave it to Brown. Upon retrieving the gun, Fletcher and Brown changed into clothes belonging to Fletcher's grandfather that they found at the house. Fletcher showed Brown the safe, which was located inside a closet.

Fletcher located Googe's purse, which contained a credit card, car keys, and $37. Fletcher placed the purse in the closet with the discarded prison clothing. Fletcher and Brown then approached the bedroom where Googe slept, and Brown entered the room. Fletcher had tied a t-shirt around his face so that Googe would not recognize him, and Brown donned a blue and red baseball cap that he pulled down over his face. Fletcher intended to remain outside of the room until Brown indicated that Googe was restrained. Brown approached the bed, pointed the gun at Googe's face, and woke her up. Brown then said, "[t]his is a stickup, roll over and you'll be all right." Googe sat up and screamed that she was frightened at least four times. She asked, "why are you doing this?" Brown told her that nothing would happen to her as long as she complied with his instructions. Brown then signaled for Fletcher, who entered the room, pushed Googe onto the bed, and tied her hands with a phone cord.

Googe informed them that she did not have any money, except maybe $40 in her purse. Brown asked what was in the safe, and she asserted that she did not have a safe. After Brown informed Googe that he knew she had a safe, she repeated that she had no money. During this interaction, Googe attempted to get out of the bed and her hands became untied. While describing these events during his post-arrest statement, Fletcher commented, "[s]he wasn't listening—she didn't want to listen."

After the cord became untied, Brown held the gun against Googe's head and pushed her back onto the bed. Fletcher then said, "you better fucking listen, we don't want to hurt you, just you better fucking listen." They continued to argue with Googe and demanded to know the personal identification number to her credit card, but she stated that she did not have one.

Googe jumped out of the bed, but Brown pushed her back down, put the gun on a dresser, and climbed on top of her. He held her down with one hand on her neck and the other on her chest and told her, "[b]itch, this ain't how it works." Googe was kicking her legs, and Fletcher picked up the gun, pressed it against her leg, and said, "[y]ou better stop moving your fucking legs or else I'm going to shoot you."

Googe then went with Fletcher and Brown to the safe. However, she said that she needed her glasses, so Brown led her back to the bedroom. Once there, Googe claimed she needed to use the restroom. She entered the restroom and tried to slam the door shut. Brown pushed the door open, and Googe hit him with a hairdryer. Brown yelled for Fletcher, who had remained by the safe. When Fletcher entered the bedroom, Brown had Googe pinned to the bed with a pillow over her face, and Googe was attempting to fight back. After Fletcher entered the bedroom, the three returned to the closet that contained the safe.

Googe opened the safe with her hands visibly shaking. Brown and Fletcher looked for money, but did not find any. Brown pointed the gun at Googe and asked where the money was. Googe repeated that she did not have any money, except for some money in her purse.

Googe then attempted to rise, but Brown pushed her down to the floor. With Googe in a fetal position, Brown wrapped his arm around her neck and mouthed to Fletcher that he was going to kill her. Fletcher stated that he watched, but otherwise did nothing. After several minutes, Brown said it was not working and released her. He mouthed to Fletcher that he would break Googe's neck, then grabbed her chin and head and attempted to do so, but failed.

Fletcher, Brown, and Googe then moved towards the den. Fletcher secured his arm around Googe's neck, and Brown attempted to pick Googe up by her feet. Brown lifted one of Googe's legs off the ground, but was unable to hold the other because she kicked at him. During the struggle, Googe scratched Fletcher, who called her a bitch and released her. When Googe attempted to rise from the ground, Fletcher struck her in the head three times—once on the cheek and twice high on the side of her head—with an open hand. Fletcher explained during his post-arrest statement that he struck her

> [b]ecause she was—she was being ignorant. . . . If she wouldn't have been being like that, she wouldn't have never got hit or nothing. She was being—. . . She was—she was ready to fight. She wanted to fight. She didn't want to just—over $37. All she had to do was just

be quiet and give up the $37 and tell—say what the PIN number is to her credit card and she would have just got tied up and left.

Fletcher stated that Brown positioned himself on top of Googe with his knees on her arms to hold her down, and choked her with both hands. Googe began kicking, so Fletcher held her legs down at the knees. Googe tried to speak, but could only make choking noises. When Googe stopped fighting, Fletcher let her go and entered another room, where he took a jewelry box. Fletcher claimed that when he returned to the den, Brown had released Googe, who was laying on her side making snoring noises. Fletcher watched her while Brown retrieved a plastic storage bag from the kitchen. Brown placed the bag over Googe's head and secured it by tying a phone cord around Googe's neck. The bag became foggy. Fletcher stated that he left the room, and when he returned, Brown informed him that Googe was dead.

Fletcher and Brown then departed from the house. Fletcher drove Googe's Lincoln Town Car, and Brown drove the stolen pickup truck. They discarded the pickup in the woods a short distance from Googe's house. The plastic bag, the telephone cord, the prison clothing, the purse, and the wallet were discarded in a retention pond.

Fletcher then described the remainder of their flight through Georgia and Tennessee, to his aunt and uncle's house in Kentucky, and then their return to Florida, where they were re-arrested.

The evidence presented during trial with respect to the discovery of the escape and Googe's murder corroborated the description of events given by Fletcher, with the exception of who strangled Googe. After the officers discovered that Fletcher and Brown were missing, a K-9 officer and his trained canine were dispatched to search for Fletcher's and Brown's scents. The canine detected a scent outside of the barbed-wire fence that separated the sheriff's office and the field. This scent led across the highway and terminated near a dance studio. The owner of the Z71 pickup truck—the first vehicle that Fletcher stated he and Brown attempted to steal—had left his truck outside of the studio to advertise that it was for sale. He received a phone call from the sheriff's office on April 15 that his vehicle had been broken into, and he travelled to the studio, where he discovered that the passenger window of the extended cab had been smashed. Additionally, the steering column and ignition had been tampered with, as though someone had tried to start the vehicle without a key.

On that same morning at approximately 9 a.m., the owner of a home and business across from the jail discovered that the ignition switch to his blue GMC van was broken and locked into position, also as if someone had forcibly attempted to start the vehicle without a key. He walked over to the sheriff's office and told officers about his vehicle. A crime scene technician observed muddy footprints that led from the dance studio towards the van.

Additionally on that morning, the owner of a tire business located across from the jail discovered that the gates of the business were lying flat on the driveway as though they had been run over. He also noticed that his Ford F150 was missing. He reported this to the sheriff's office. The truck was later discovered in the woods near Googe's residence.

Meanwhile, at approximately 6:40 that morning, a deputy with the Clay County Sheriff's Office observed a four-door gold Lincoln with Putnam County license plates while he drove home from work. He became suspicious because nothing was open in the area, he rarely saw Putnam County plates there, and his office had received a "be on the lookout" for two escapees from the Putnam County Jail. He wrote down the tag number and accelerated to examine the individuals in the vehicle. He was able to see the passenger, who was wearing a blue baseball cap with a red bill. The officer continued home, and later ran the plate number through the National Crime Information Center database. He discovered that the vehicle was owned by Googe, who he knew had been married to Fletcher's grandfather. He recalled that Fletcher was one of the escaped prisoners, and contacted the Putnam County Sheriff's Office. Later that day, he saw a television broadcast with photographs of Fletcher and Brown, and he recognized Brown as the passenger in the Lincoln.

Because of the observation by the Clay County deputy, a warrants officer with the Putnam County Sheriff's Office was asked to make contact with Googe. When the officer arrived at the property, the Lincoln was not in the carport. The officer knocked on the door and, when nobody responded, walked around the house knocking on doors and windows. He travelled to a nearby grocery store to ask if anyone had seen Googe, her Lincoln, or a truck matching the one missing from the tire business. Nobody had seen Googe or the missing vehicles, and the officer returned to the property. When two other officers arrived, they entered the home and found Googe dead.

A crime lab analyst with the Florida Department of Law Enforcement (FDLE) located pliers above the firewood door that created an entrance into the home. The lock on the door was still attached, but the hasp was broken. Inside the home, the analyst found an open jewelry box on the floor of the study. The interior walls of the family room were decorated with a sword, knives, and a revolver. The weaponry was supported by wooden pegs, but one set of pegs was unadorned. In the master bedroom, he found a phone set on the floor with the cord broken off, and a hairdryer in the bathroom. Near Googe's body, he found part of a broken eyeglasses chain. The remainder of the chain, as well as the eyeglasses, were found near the safe.

A detective with the Putnam County Sheriff's Office contacted Googe's credit card company and obtained a subpoena for records showing any transactions on April 15, 2009. Two transactions occurred on that date, one at a Florida gas station, and another at a Georgia gas station.

Law enforcement learned that after Brown and Fletcher left Googe's home, they proceeded to the home of Brown's aunt. She allowed Brown into the house and he used her computer to look up directions, which he wrote down. Brown then departed, and his aunt testified that she saw him enter the passenger's seat of a vehicle resembling a tan Cadillac with a Caucasian driver. She did not observe any scratches or other physical injuries on Brown.

The FDLE crime lab analyst who processed the Lincoln found a piece of paper with handwritten directions. The paper had fingerprints and handprints that were identified as belonging to Brown. A soda bottle was also discovered, which had a fingerprint that was identified as belonging to Brown. Brown's fingerprints were also identified on a handbook and a plastic shopping bag found in the vehicle.

The FDLE also analyzed swabs taken from the Lincoln for DNA evidence. The analyst found a complete DNA profile on the swab taken from the headlight switch and an interior door handle that matched Fletcher's DNA profile. The probability that the DNA profile would match another individual is approximately one in 490 trillion Caucasians, one in 13 quadrillion African Americans, and one in

1.1 quadrillion Southeastern Hispanics. Two soda bottles found in the car were also analyzed for DNA evidence, and the analyst found mixed DNA profiles on each bottle. With respect to the first bottle, Brown was a possible contributor, but no determination could be made as to whether Fletcher was a possible contributor. More than 99% of Caucasians, African Americans, and Southeastern Hispanics could be excluded as contributors to the mixed DNA profile. With respect to the second bottle, Brown and Fletcher were both possible contributors to the mixed profile, and again more than 99% of Caucasian, African American, and Southeastern Hispanic individuals could be excluded as contributors. With respect to the fingernail scrapings taken from Googe, the analyst found a partial DNA profile that matched the known profile of Fletcher. The probability that the partial DNA profile would match another individual is approximately one in 260 million Caucasians, one in 3.6 billion African Americans, and one in 580 million Southeastern Hispanics.

The medical examiner determined that the cause of Googe's death was asphyxia due to manual strangulation. He identified fingertip contusions[2] under the chin, as well as hemorrhages in the neck area. The injuries were consistent with a person grabbing Googe around the neck and squeezing with his or her thumbs down onto her neck. Additionally, the cartilage of Googe's larynx was

---

2. Fingertip contusions are contusions that resemble fingertips.

fractured and surrounded with contusions and hemorrhages, and the thyroid cartilage was fractured. The medical examiner found a contusion on Googe's left upper eyelid, which was the result of blunt trauma, as well as a contusion on the right side of her scalp. The scalp contusion was superficial, and there was no underlying skull fracture, bleeding into her brain, or subdural or subarachnoid hemorrhages. On her right arm, he found fingertip contusions, which indicated that she was restrained by someone. Because Googe was elderly, little force would be necessary to cause this kind of bruising. There was also a contusion and ligature marks on Googe's left wrist and a superficial laceration on her right forearm that most likely resulted from being held by the wrist. The medical examiner also found abrasions on her knees.

The medical examiner determined that all of Googe's injuries occurred pre-death and during the same time frame. Because there was no significant trauma to the head that would cause a loss of consciousness, he also concluded that the injuries occurred while Googe was conscious. Significantly, there was no hemorrhaging at the top of the brain, despite the fact that Googe was elderly and would bleed more easily.

On May 25, 2012, a jury found Fletcher guilty of the first-degree murder of Googe, two counts of grand theft of a motor vehicle, home-invasion robbery, two counts of burglary, and escape. During the penalty phase, the State presented

records of Fletcher's commitment to the Florida Department of Corrections (DOC) for a previous conviction. The State also presented the victim impact statement of Googe's daughter, read by Googe's brother.

The defense presented the testimony of Fletcher's brother, Jeffrey. Jeffrey testified that their parents separated when Jeffrey was between the ages of five and seven, and he lived with Fletcher and their father for approximately one year after the separation. During that year, their father drank almost every day. Additionally, he testified that their father would spank him if he did something wrong, but he never saw his father abuse Fletcher. After a year, Jeffrey moved in with his mother and would spend one or two weekends each month with Fletcher and their father until he was eleven or twelve, when he stopped visiting. Jeffrey testified that Fletcher and his mother spoke frequently on the phone before she died and they had a good relationship.

Fletcher also presented the testimony of his father, Ricky. Ricky testified that when Fletcher was approximately five or six years old, Ricky and Fletcher's mother began having violent domestic disputes that always involved alcohol. On one occasion, Ricky threatened the mother with a shotgun, but stopped when he saw Fletcher watching. Ricky was arrested six or seven times for violent acts, which were witnessed by the children. The mother obtained a restraining order

against Ricky at one point. Ricky testified that he and Fletcher's mother separated when Fletcher was about eleven years old.

Fletcher presented mental health mitigation through the testimony of Dr. Harry Krop, a licensed psychologist. Dr. Krop's assistant, a licensed mental-health professional, met with Fletcher once to conduct psychological testing and a neuropsychological evaluation. The testing revealed that Fletcher had no brain damage, possessed an average IQ, and functioned in the top 40% of the population. Fletcher was an underachiever in school, which Dr. Krop concluded resulted from emotional, family, and environmental issues.

Dr. Krop conducted a Minnesota Multiphasic Personality Inventory (MMPI), the results of which were invalid because of inconsistent answers. Dr. Krop testified that there are several reasons for MMPI test results to be invalid, including that the person taking the test is in distress. Dr. Krop did not believe that Fletcher was malingering because other tests in the neuropsychological battery resulted in normal or average results.

Dr. Krop diagnosed Fletcher with polysubstance dependence, which he determined had been ongoing since Fletcher was eleven years old, the age that Fletcher asserted he began drinking and using marijuana. Since then, Fletcher has used other drugs, including methamphetamines, prescription drugs, powder cocaine, crack cocaine, acid, and mushrooms. Dr. Krop also diagnosed Fletcher

with chronic insomnia, chronic depressive disorder, and antisocial personality disorder. Dr. Krop noted that Fletcher had been diagnosed in the past with post-traumatic stress disorder (PTSD), but no longer displayed any symptoms of the disorder. Although Fletcher's records reflected a diagnosis of bipolar disorder, Dr. Krop did not observe any symptoms of the disorder, and testified that the reference could have been a misdiagnosis.

Dr. Krop believed Fletcher abused drugs and alcohol to self-medicate for depression. He testified that Fletcher suffered from both situational depression from his incarceration and a lifetime of depression due in part to his family environment. Additionally, Fletcher's mother died of brain cancer when Fletcher was eighteen years old. The last six months of her life were very difficult, and Fletcher was incarcerated at the time of her funeral. Although he was allowed a private viewing, he was not permitted to attend the funeral. Further, Dr. Krop testified that Fletcher had a history of self-harm and cut himself when he was fifteen years old.

Dr. Krop additionally testified that Fletcher was raised in an extremely dysfunctional family environment, which included physical abuse, emotional abuse, domestic violence, and a tumultuous relationship between his parents. Both parents were unfaithful and would use Fletcher as an intermediary. Fletcher felt abandoned by his mother after his parents separated. Fletcher described to Dr.

Krop physical abuse by his father, which included being struck with a belt, being instructed to make a paddle that the father would then use to strike him, being struck with his father's fist on one occasion, being choked on one occasion, and being threatened with a gun on one occasion.

Fletcher's aunt described to Dr. Krop severe domestic violence between Fletcher's parents, in which law enforcement was called. There was also a domestic violence incident between Fletcher's father and a subsequent girlfriend.

Dr. Krop testified that Fletcher resented Googe. Fletcher explained to Dr. Krop that his resentment was due to friction that arose between his grandfather and Googe because his grandfather continued to support Fletcher, despite the repeated instances of trouble.

The defense also presented the testimony of a mental health specialist who had counseled Fletcher during his incarceration at the Suwannee Correctional Institution. She testified that inmates were designated as level one, two, or three according to the amount of mental-health treatment they would receive, with level one being no treatment. Fletcher was assigned a level three, was prescribed psychotropic medications, and was diagnosed with depression.

In rebuttal, the State presented the testimony of Dr. Gregory Prichard, a licensed psychologist. Dr. Prichard testified that he found no evidence of neurological issues. He diagnosed Fletcher with antisocial personality disorder,

polysubstance dependence, and depressive disorder not otherwise specified. He testified that Fletcher had been treated for depression during prior incarcerations and responded well to antidepressants. However, when released from incarceration, Fletcher returned to the use of drugs.

The jury recommended a death sentence for the murder of Helen Googe by a vote of eight to four. During the Spencer[3] hearing, the State presented the victim impact statements of Googe's brother and nephew. The defense asked the trial court to review the presentence investigation report and to consider the mitigating circumstances contained in it, including Fletcher's history of drug and alcohol abuse and his dysfunctional family. Fletcher then read a statement he had prepared, in which he apologized to his and Googe's families and detailed his struggles through childhood and adolescence.

The trial court found the evidence established that Fletcher, not Brown, killed Googe. The trial court considered that Fletcher admitted he was the architect of the criminal episode; stole the jack and crank shaft; knew Googe, while Brown did not; had been to Googe's home, while Brown had not; knew about the firewood door and the safe, which Brown did not; knew Googe's financial status, while Brown did not; hated Googe, while Brown did not; and took the keys to

---

3. Spencer v. State, 615 So. 2d 688 (Fla. 1993).

Googe's car.  Additionally, Fletcher had scratches on his arms, while Brown did not, and Fletcher's DNA was under Googe's nails, while Brown's was not.

The trial court found that the State had proven beyond a reasonable doubt the existence of three statutory aggravating circumstances: (1) the murder was committed by a person previously convicted of a felony and under a sentence of imprisonment (great weight); (2) the murder was committed while Fletcher was engaged, or was an accomplice, in the commission of a robbery (great weight), merged with the aggravating circumstance that the murder was committed for financial gain (no added weight); and (3) the murder was especially heinous, atrocious, or cruel (HAC) (great weight).

The trial court found one statutory mitigating circumstance—Fletcher's age of twenty-five at the time of the crime (minimal weight).  The trial court additionally found the following nonstatutory mitigating circumstances: (1) Fletcher was physically abused by his alcoholic father in the past (little weight); (2) Fletcher suffered from chronic addiction to drugs in the past (moderate weight); (3) Fletcher has been treated for and suffers from depression (little weight); (4) Fletcher has been treated for PTSD in the past (slight weight); (5) as a child, Fletcher witnessed his mother being physically abused by his father (some weight); (6) Fletcher has attempted suicide (little weight); (7) Fletcher responded well to counseling while at the Suwannee Correctional Institute (little weight); (8) Fletcher

reported that he was awake all night before the escape and consumed methamphetamines (very little weight); (9) Fletcher obtained his GED while incarcerated (some weight); (10) Fletcher comes from a dysfunctional family (some weight); (11) Fletcher's mother died when he was eighteen, and he had a close relationship with her (little weight); (12) Fletcher has artistic ability (slight weight); (13) Fletcher expressed remorse (some weight); (14) Fletcher displayed good behavior during the trial and all subsequent court proceedings (some weight); (15) Fletcher cooperated with police after his arrest by providing them with a lengthy videotaped statement (moderate weight); and (16) Brown, Fletcher's accomplice, pled guilty to the same offenses and received a life sentence (great weight). The trial court found the nonstatutory mitigating circumstance that Fletcher had been treated for bipolar disorder had not been established.

The trial court specifically found that

[d]espite the existence of a number of mitigating circumstances and the weight assigned to each by this Court, the nature and quality of those factors, including the disparate sentences, pale in comparison to the strength of the aggravating circumstances established in this case. The Court now finds that the aggravating circumstances far outweigh the mitigating circumstances. The fact that the homicide was committed while the Defendant had previously been convicted of a felony and was under a sentence of imprisonment, the fact that the murder was committed for pecuniary gain during the course of a robbery, and the heinous, atrocious and cruel manner in which the murder was committed, greatly outweighs the statutory and non-statutory mitigating circumstances established by the record.

- 21 -

Accordingly, the trial court followed the jury's recommendation and sentenced Fletcher to death.

This direct appeal followed.

## ANALYSIS

### Consolidation of Offenses

Fletcher was charged by indictment with one count of escape, two counts of grand theft of a motor vehicle, one count of first-degree murder, and one count of home invasion robbery. Fletcher was additionally charged in two separate informations with two counts of burglary of a structure or conveyance (i.e., the first two motor vehicles that Fletcher attempted to steal). The State moved to consolidate both burglary offenses with the crimes charged in the indictment, and the trial court granted the motion. Fletcher later moved to sever the escape charge and one of the grand theft charges because (1) they were temporally and physically separate from the other counts, and (2) a separate trial for each was necessary for a fair determination of Fletcher's guilt or innocence. Fletcher subsequently filed a supplemental motion to sever the motor vehicle burglary charges.

The trial court denied the motions to sever on the basis that the charges were all part of the same criminal episode and severance was not necessary for a fair determination of Fletcher's guilt or innocence. The trial court noted that all of the crimes occurred within approximately ten miles of one another and on the same

morning.  Additionally, the trial court found that each crime was relevant to the others because they were all committed to evade re-arrest.

A trial court's decision on consolidation and severance is reviewed for an abuse of discretion.  Crossley v. State, 596 So. 2d 447, 450 (Fla. 1992).  Two or more offenses may be charged together if they are based on the same act or transaction, or on two or more connected acts or transactions.  Fla. R. Crim. P. 3.150(a).  Additionally, two or more indictments or informations that charge related offenses shall be consolidated for trial if a timely motion is filed by either party.  Fla. R. Crim. P. 3.151(b).

There must be a meaningful relationship between or among charges before they can be tried together.  Lugo v. State, 845 So. 2d 74, 93 (Fla. 2003).  In other words, the crimes must be linked in some significant way.  Id.  Whether acts or transactions are connected is considered in an episodic sense.  Fotopoulos v. State, 608 So. 2d 784, 789 (Fla. 1992).  Courts may consider whether the acts or transactions are temporally or geographically associated, the nature of the crimes, and the manner in which they are committed.  Id. at 789-90.

When a defendant engages in a crime spree uninterrupted by any significant period of respite between the individual offenses, the crimes are considered to be connected and a single uninterrupted episode.  See Ellis v. State, 622 So. 2d 991, 999 (Fla. 1993).  Additionally, even where there is a significant lapse of time, if

there is a causal link—one crime is used to induce the other—then consolidation is appropriate.  See Ellis, 622 So. 2d at 999.

However, a defendant is entitled to severance if severance is necessary to achieve a fair determination of guilt or innocence.  Fotopoulos, 608 So. 2d at 790. Interests in practicality, efficiency, expense, convenience, and judicial economy do not outweigh a defendant's right to a fair determination of guilt or innocence. Wright v. State, 586 So. 2d 1024, 1029-30 (Fla. 1991).

We conclude that the crimes in this case were properly tried together.  On the morning of April 15, Fletcher executed a plan to escape, with the intent to travel to Googe's house.  His goal was to acquire funds to avoid re-arrest.  Because Googe lived approximately ten miles away from the jail, Fletcher sought transport, which resulted in failed attempts to steal two vehicles and the successful theft of a third.  He used the third vehicle to travel to Googe's house, where he surreptitiously entered the home and, after a struggle, eventually strangled her. After the murder, Fletcher stole her vehicle in a continued effort to avoid re-arrest. Each of the events of that morning demonstrates a resolute effort to effectuate the goal of escaping and avoiding re-arrest.  The crimes were causally connected, and each crime committed subsequent to the escape cannot be fully understood without this context.  These events were all part of a single and uninterrupted criminal spree, and occurred within a close temporal and geographic proximity.

Accordingly, the crimes have a meaningful relationship, are linked in a significant way, and were properly consolidated.

In this case, Fletcher has not established that severance was required in order to ensure "the fair determination of guilt or innocence." Fotopoulos, 608 So. 2d at 790. Cf. State v. Vazquez, 419 So. 2d 1088, 1090 (Fla. 1982) (holding that severance was necessary because even though the three crimes were committed during the same incident and were all admissible, the evidence needed to prove one of the counts would prejudice the defense to the other counts, and thus could "deprive [the defendant] of the presumption of innocence"); McCray v. State, 416 So. 2d 804, 806-07 (Fla. 1982) (emphasizing that the critical element in determining a motion to sever is examining whether a defendant's right to a fair determination of guilt or innocence is compromised). Although some prejudice exists during any trial in which multiple offenses are tried together, this "garden variety" prejudice is not sufficient to justify severance. Lugo, 845 So. 2d at 96 n.39.

Accordingly, we deny relief on this claim.

**Motion to Suppress**

Prior to the post-arrest interrogation, the following exchange occurred between Fletcher and the deputies who escorted him into the interrogation room:

FLETCHER:  Will you do me a favor and loosen the (inaudible) around the shackle?

UNIDENTIFIED MALE DEPUTY:  What's that?

FLETCHER:  Will you loosen the shackle a little bit, please?

UNIDENTIFIED MALE DEPUTY:  Have a seat.

UNIDENTIFIED FEMALE DEPUTY:  No.  No.

FLETCHER:  No?  It's too tight.  I don't want to talk to nobody then.

UNIDENTIFIED FEMALE DEPUTY:  Sit down.  (Inaudible) waist chains first and then we can do the shackles.

Shortly after this exchange, the detective who interrogated Fletcher and an investigator from the State Attorney's Office entered the room, and the deputies left.  The detective read the Miranda[4] rights to Fletcher, and asked Fletcher if he understood those rights.  Fletcher responded affirmatively.  The detective then inquired whether, with those rights in mind, Fletcher was willing to speak with the detective and the investigator.  Again, Fletcher responded affirmatively, and he signed a waiver.

Before trial, Fletcher filed a motion to suppress his post-arrest statement on the basis that he invoked his right to remain silent during the exchange with the deputies.  The trial court denied the motion and noted in its order that Fletcher's statement "I don't want to talk to nobody then" was not given in response to a question or during the interrogation; that the interrogating detective was not in the

_____

4.  Miranda v. Arizona, 384 U.S. 436 (1966).

room at the time of the statement; and that the deputies to whom the statement was directed left the room before the interrogation commenced. The trial court found that the statement was conditional on the deputies loosening the shackle. The trial court also found that Fletcher made a voluntary, knowing, and intelligent waiver of his Miranda rights.

A trial court's ruling on a motion to suppress is clothed with a presumption of correctness. Murray v. State, 692 So. 2d 157, 159 (Fla. 1997). A reviewing court must interpret the evidence, reasonable inferences, and deductions in the manner most favorable to sustaining the trial court's ruling. Id. Mixed questions of law and fact are reviewed de novo. Connor v. State, 803 So. 2d 598, 605 (Fla. 2001).

We hold that the statement by Fletcher, "I don't want to talk to nobody then," was neither an equivocal nor an unequivocal invocation of his right to remain silent. The purpose of the statement was to persuade the guards to loosen the shackles. No questioning, discussion, or even casual conversation occurred prior to this statement. Fletcher was simply being secured in the interrogation room, and during this process he made a conditional statement to bargain with the deputies to have his shackles loosened.

Fletcher's reliance on Traylor v. State, 596 So. 2d 957 (Fla. 1992), is misplaced. In Traylor, we commented that an interrogation must cease if the

defendant indicates "in any manner" that he or she does not wish to be interrogated. Id. at 966. However, the use of the phrase "in any manner" by this Court was to convey only that no magic words are necessary to invoke the right to remain silent. See State v. Owen, 696 So. 2d 715, 719 (Fla. 1997); Traylor, 596 So. 2d at 966. There is no discussion in Traylor with respect to what qualifies as an equivocal or unequivocal invocation of the right to remain silent. Traylor simply acknowledges that when a defendant has made an invocation, all interrogation must cease. 596 So. 2d at 966. Thus, Traylor does not provide any guidance with respect to whether the statement by Fletcher was an invocation of the right to remain silent.

Moreover, even if we were to conclude that the statement was an equivocal invocation of the right to remain silent, any uncertainty as to whether Fletcher sought to invoke this right was clarified by the subsequent reading of the Miranda warnings prior to the interrogation.[5] This case is similar to Henry v. State, 574 So.

---

5. One basis relied on by the trial court when it denied the motion to suppress was that the alleged invocation was equivocal and did not need to be clarified. We note that when a defendant who has not yet waived the right to remain silent makes an ambiguous statement with regard to the right, the police must clarify whether the ambiguous statement was an invocation of that right. See Cuervo v. State, 967 So. 2d 155, 162 (Fla. 2007); see also Miles v. State, 60 So. 3d 447, 452 (Fla. 1st DCA 2011) ("Even if the statement could be construed as an equivocal request to remain silent, because [the defendant] had not yet waived his Miranda rights, the detectives were required to clarify his intent before proceeding further with the interrogation."). However, because this was not the only basis for

- 28 -

2d 66, 68-69 (Fla. 1991), in which the defendant stated to one officer while the second officer was outside the room, "I'm not saying nothing to you. Besides, you ain't read me nothing yet." When the second officer entered the room, he read the defendant the <u>Miranda</u> rights. <u>Id.</u> at 68. The first officer never informed the second officer of the defendant's statement. <u>Id.</u> This Court held that the statement was not an equivocal request to remain silent, and even if it had been, the second officer effectively, if unintentionally, clarified the defendant's intent when he read the <u>Miranda</u> rights. <u>Id.</u> at 70.

Similarly, even if we were to conclude that Fletcher made an equivocal statement as to his right to remain silent, the subsequent reading of the <u>Miranda</u> rights clarified his intent. Accordingly, we hold that the trial court properly denied the motion to suppress and deny relief on this claim.

### Opening Statements

During opening statements, defense counsel admitted that Fletcher committed six of the seven crimes with which he was charged. Defense counsel stated:

> As you know, there are seven charges against Timothy Fletcher, six of which we are not going to seriously dispute.
> Timothy Fletcher, in the early morning hours of April the 15th of 2009, was housed in the same cell as Doni Ray Brown, in the same cell at the Putnam County Jail.

---

the trial court's denial of the motion to suppress, we hold that the denial was nonetheless proper for the alternate reasons stated above.

And the two of them, in the early morning hours, did break out of that cell . . . .

. . . .

After they left the jail, . . . there's a series of places, three in a row, where Doni Ray Brown and Timothy Fletcher, acting together, went to those places and first attempted to take a couple of vehicles in—a couple of a series in the early morning hours of the 15th and then, eventually, did take a truck that belonged to Mr. Louis and take that truck and went over to Helen Googe's residence.

The evidence will show that Helen Googe's residence was, in fact, entered by both Timothy Fletcher and Doni Ray Brown.

. . . .

There's reasonable doubt, we're going to ask you, on the first-degree-murder charge, which was one of the seven charges against Mr. Fletcher, to render a verdict of not guilty because it's our contention that the State will never be able to prove beyond a reasonable doubt the first-degree-murder charge.

As I say, I say this with a focus that the other charges, the theft of Mrs. Googe's car, the attempted burglary of two other vehicles, the theft of Mr. Louis' vehicle, those really are not going to be in dispute, the escape from the Putnam County Jail.

The State does have to prove those. They brought them— brought forth in the trial. They still have to prove those charges, but many of the witnesses regarding those events and those allegations will not be seriously or lengthily examined or questioned about those events.

After the first witness had testified, the trial court asked Fletcher the following

questions:

COURT: Mr. Fletcher, during opening statements, your attorney, although not necessarily conceding guilt on the other counts other than first-degree murder, did indicate there would not be really contesting the other counts. Have you had a discussion with Mr. Wood about the strategy in defending you in this case?

FLETCHER: Yes, ma'am.

- 30 -

COURT:  And do you agree with the strategy that—that he's proceeding with?

FLETCHER:  Yes, ma'am.

COURT:  All right.  So you agree with the strategy in the opening statement?

FLETCHER:  Yes, ma'am.

Fletcher claims that the admissions by counsel during opening statements rendered the trial fundamentally unfair, resulted in his guilty verdicts, and conceded two of the three aggravating circumstances.  He further claims that the colloquy was insufficient to cure the resulting prejudice because the court did not plainly inform him that counsel conceded guilt on all but one count, and did not address the implications of such concessions on the penalty phase.

This issue presents a claim of ineffective assistance of trial counsel.  Such claims are rarely cognizable on direct appeal, and will be considered only when (1) the ineffectiveness is apparent on the face of the record, and (2) it would be a waste of judicial resources to require the trial court to address the issue in postconviction proceedings.  See Robards v. State, 112 So. 3d 1256, 1266 (Fla. 2013).

We have held that admission of participation in noncapital crimes while contesting a capital charge can be a legitimate tactical decision.  See Kormondy v. State, 983 So. 2d 418, 431 (Fla. 2007).  As a result, such a tactic does not demonstrate ineffectiveness on the face of the record.  Moreover, Fletcher

informed the trial court that he discussed the strategy with his counsel and agreed to it. Whether such a discussion occurred between Fletcher and his counsel, and the contents of such a discussion, could be discovered only through an evidentiary hearing. Therefore, we decline to consider this claim on direct appeal.

## References to Past Crimes and Sentence

Fletcher next alleges that he was unduly prejudiced and denied a fair trial based on two[6] references that were made to his incarceration at the time of the escape. In the first comment, the officer who transported Fletcher in the vehicle from which Fletcher acquired the jack and jack handle stated, "I believe Mr. Fletcher told me that he had been sentenced for—." Defense counsel stopped the testimony with an objection and moved for a mistrial. The trial court denied the motion and offered to provide a curative instruction, which the defense declined.

The second comment that Fletcher contends was unduly prejudicial was a statement made by Fletcher himself during his post-arrest statement, a recording of which was played for the jury. Prior to trial, the trial court had granted the

---

6. Fletcher references a third statement by an officer that Fletcher had been housed in the felony area at the time of his escape. However, no argument or elaboration is made with respect to this comment, and it appears to have been inserted to bolster the claim with respect to the first challenged comment. To the extent that Fletcher asserts this third comment denied him a fair trial, we conclude that it was insufficiently pled. See Heath v. State, 3 So. 3d 1017, 1029 n.8 (Fla. 2009) ("Vague and conclusory allegations on appeal are insufficient to warrant relief.").

defense's request for several redactions.  Before the video was played, the State

redacted portions of the recording and provided the recording to the defense to

verify that all redactions were made.  However, the following statement had not

been redacted from the recording or the transcripts provided to the jury to read

while the recording was played:

> INVESTIGATOR:  When did you start planning [the escape]?
> Obviously, before April 2nd because you took the jack.
>
> FLETCHER:  No.  I didn't really—I didn't fully plan on escaping
> before that, but I had talked about it.  <u>And I had just got sentenced to
> the ten years</u>.  My grandma just died, my—my real grandma, my
> grandpa's first wife—
>
> INVESTIGATOR:  Right.
>
> FLETCHER:  —just died in December.  And I don't know.  I just—
> <u>ten years is a long-ass time</u>.  I thought it was before, but—
>
> DEFENSE COUNSEL:  Judge, I need to take something out of the—
>
> COURT:  All right.

(Emphasis supplied.)  The defense again moved for a mistrial.  The trial court

reserved ruling on the motion and collected the transcripts.  Defense counsel

declined the trial court's offer for a curative instruction.  The trial court later

denied Fletcher's renewed motion for mistrial.

The statements Fletcher challenges were the subject of a motion in limine

that was granted by the trial court, and no references to Fletcher's sentence should

have been heard by the jury.  The State has a duty to prepare its witnesses so as to

- 33 -

avoid any violation of a court order. Each witness presented by the State should have been clearly instructed not to testify with respect to the sentence. These unpermitted disclosures could have been avoidable with adequate preparation.

However, a motion for mistrial is to be granted only when an error is so prejudicial as to vitiate the entire trial. See Silvia v. State, 60 So. 3d 959, 976 (Fla. 2011). The ruling on such a motion is reviewed for abuse of discretion. Id. Although evidence with regard to the underlying crime that resulted in the incarceration leading to the escape should not have been heard by the jury, the standard for a motion for mistrial is high, and we conclude that the remarks in this case were not so prejudicial as to vitiate the entire trial.

Remarks that relate to a defendant's prior imprisonment are to be evaluated in the context of the surrounding circumstances and do not always require reversal. See Cox v. State, 819 So. 2d 705, 713-14 (Fla. 2002); see also Ferguson v. State, 417 So. 2d 639, 642 (Fla. 1982); Nodel v. State, 579 So. 2d 768, 768 (Fla. 3d DCA 1991). A comment that is brief, isolated, and inadvertent may not warrant a mistrial. See Ruger v. State, 941 So. 2d 1182, 1185 (Fla. 4th DCA 2006).

Here, the statement by the officer that Fletcher had been sentenced was brief and did not reveal the nature of the conviction or the severity of the sentence. The statement informed the jury only that Fletcher was incarcerated pursuant to a conviction. Any prejudice resulting from this statement could have been cured by

an instruction, but defense counsel decided that no further attention should be drawn to the statement and declined such an instruction. Furthermore, during trial, Fletcher stipulated that he was in lawful custody prior to the escape, and therefore the jury could not have been surprised that he was incarcerated. Thus, we conclude that this brief statement by the officer did not vitiate the entire trial.

With respect to the unredacted statement by Fletcher, the trial court stated, "[d]espite the fact that it was in violation of my ruling on the motion in limine, it was just a blip." The unredacted statement was brief in comparison to the lengthy transcript and video statement, which was over two and a half hours long. Neither the trial court nor defense counsel brought the jury's attention to the statements regarding the length of Fletcher's sentence.

Accordingly, we conclude that these brief and fleeting statements were not so prejudicial as to vitiate the entire trial and deny this claim.

### Guilt-Phase Closing Statements

<u>Post-Arrest Silence</u>

During his post-arrest statement, after he was informed that the police had swabbed Googe's nails for DNA evidence, Fletcher stated, "I really don't even want to tell you everything that happened, to be honest with you." During the closing statements, the prosecutor referenced this statement:

> When you—when he was—when the defendant was confronted with the possibility that he left DNA behind, all of a sudden, he went

> from I didn't touch her, I wasn't involved in her strangulation, I went into the other room, I didn't see anything, you know, until it was over, Doni Brown came to me and he said, oh, she had a heart attack.
>
> He went from that story to, oh, oh, I kind of lied to you. <u>And I—at first, he said I don't really want to talk about it</u>.

(Emphasis supplied.) Fletcher contends that this was an improper comment on his post-arrest silence. No objection was made to this statement during trial. Therefore, this claim is reviewed for fundamental error. <u>Mosley v. State</u>, 46 So. 3d 510, 519 (Fla. 2009). Error is fundamental when it reaches down into the validity of the trial such that a guilty verdict could not have been obtained in the absence of the error. <u>Id.</u>

Although comments on post-<u>Miranda</u> silence are generally prohibited, <u>see</u> <u>Doyle v. Ohio</u>, 426 U.S. 610, 619 (1976), this Court has held that no such prohibition exists where a defendant does not invoke his Fifth Amendment privilege against self-incrimination and refuses to answer "one question out of many." <u>Downs v. Moore</u>, 801 So. 2d 906, 911 (Fla. 2001); <u>Valle v. State</u>, 474 So. 2d 796, 801 (Fla. 1985), <u>vacated on other grounds</u>, 476 U.S. 1102 (1986). Here, Fletcher not only waived his right against self-incrimination by engaging in a lengthy interview with police, but also continued to talk to the officers even after he made this statement as a direct part of that lengthy interview, which was played for the jury.

Accordingly, we hold that the prosecutor did not improperly comment on any post-arrest silence. However, even if there was error, it was not fundamental. We therefore deny relief on this claim.

Sending a Message

During closing arguments, the prosecutor stated:

> And I ask you, ladies and gentlemen, send the message to this defendant that his behavior is not acceptable.
> Send the message to him and tell him, it's not okay to kill people.
> You send that message and you find him guilty as charged.

(Emphasis supplied.) Fletcher contends that these comments by the prosecutor constitute an improper attempt to bypass the prohibition against asking jurors to send a message to the community through their verdict. We agree.

We have clearly stated that prosecutors may not ask the jury to send a message through its verdict. See, e.g., Campbell v. State, 679 So. 2d 720, 724 (Fla. 1996); Bertolotti v. State, 476 So. 2d 130, 133 (Fla. 1985). Prosecutors are not permitted to make statements that inject fear and emotion into jury deliberations. See Urbin v. State, 714 So. 2d 411, 419 (Fla. 1998).

The substitution of Fletcher in lieu of the community as the recipient of the message does not take this statement outside of the prohibition. In Urbin, the Court addressed a statement similar to the one made by the prosecutor here. 714 So. 2d at 419-421. The prosecutor in Urbin commented during closing statements,

"Now this defendant wants a life sentence for robbing somebody and murdering them. What kind of message would that send—what kind of message would a life recommendation send to this defendant?" Id. at 421. This Court held that the statement was improper even though the prosecutor urged the jury to send a message to the defendant and not the community. Id. We reiterate that such statements are improper and prohibited. As we have previously explained, the prosecutor has a duty to seek justice—not merely "win" a death recommendation. See, e.g., Delhall v. State, 95 So. 3d 134, 170 (Fla. 2012); Urbin, 714 So. 2d at 422; Bertolotti, 476 So. 2d at 133.

No objection was made to the improper comment, and therefore we review this claim for fundamental error. An error is not fundamental unless improper comments are so prejudicial that they tainted the jury's verdict. See Mendoza v. State, 964 So. 2d 121, 133 (Fla. 2007). The phrase "send a message" was iterated only three times during the closing statements, all at roughly the same time. The prosecutor did not use this as a theme, and these were the only improper comments made during the closing statements. Further, the evidence against Fletcher, including his post-arrest statement and the DNA evidence, is overwhelming. As a result, we conclude that these improper statements did not taint the jury's verdict, and we deny relief on this claim.

**Nonstatutory Aggravation**

During the penalty phase, Fletcher presented mental health mitigation evidence through the testimony of Dr. Krop, a psychologist. In rebuttal, the State presented the testimony of Dr. Prichard, another psychologist. Both doctors diagnosed Fletcher with antisocial personality disorder. The subclaims in this issue relate to their testimony.

## Future Dangerousness

Dr. Prichard testified that forensic psychologists employ a psychopathy checklist to determine whether a person is a psychopath, which he stated is important to determine treatment recommendations. He testified that:

> A psychopath is basically a criminal variant that has a number of personality and behavioral characteristics that make them fairly unique, even among criminal people, even among people with a criminal personality.
> It's kind of the turbocharged antisocial personality disordered individual.[7]

Dr. Prichard explained how the test is scored and that a score of thirty or higher out of forty meant that the person was psychopathic, or had "a lot of the behavioral and personality characteristics on the psychopathy checklist that connote that the person is psychopathic." He testified that he conducted such a test on Fletcher, and began to testify as to Fletcher's score on the test, but defense counsel objected.

---

7. Dr. Krop had previously explained that the psychopathy checklist is highly correlated with antisocial personality disorder and that many of the traits overlap.

The trial court ruled that the results were relevant only to future dangerousness and were not admissible. Further, the trial court stated that the only rebuttal testimony that was relevant to the psychopathy checklist was whether each doctor determined the test to be relevant.

Fletcher asserts that this testimony, and testimony that antisocial personality disorder is a chronic disorder, constituted evidence of future dangerousness, which is improper nonstatutory aggravation. Assertions of future dangerousness may not be used by prosecutors as a basis for the death sentence. See Delhall, 95 So. 3d at 168.

We hold that these statements did not constitute improper nonstatutory aggravation. The only direct reference to future dangerousness during the penalty phase was the unchallenged testimony of Dr. Krop that psychopathic traits are used to perform risk assessments for sexual offenders. Dr. Prichard did not testify that Fletcher was a psychopath or that psychopaths posed a future threat. Rather, he testified that the psychopathy checklist tested for psychopathic traits. Additionally, he did not testify as to what psychopathic traits Fletcher exhibited, only that he performed the test on Fletcher. Such references in and of themselves do not improperly interject future dangerousness into the proceedings, and therefore this testimony is not evidence of a nonstatutory aggravating factor. Accordingly, we deny relief on this claim.

## Prior Criminal Record

To explain how Dr. Prichard determined that Fletcher had one criteria of antisocial personality disorder—that the individual fails to conform to social norms with respect to lawful behaviors—Dr. Prichard testified:

> For Mr. Fletcher, we have his—he began criminal offending at approximately the age of 13 or 14.
> He began stealing cars. He indicated in my interview with him that he had ten juvenile arrests.
> He had at least ten school suspensions before he was expelled during the ninth-grade year.
> So a lot of criminal misbehavior and general misbehavior in the school environment and outside the school environment.
> He was first sent to prison as a youthful offender. That was for crimes in 2000. He's—

At that point, defense counsel objected, the jury was excused, and the remainder of Dr. Prichard's testimony with regard to the criteria for antisocial personality disorder was proffered. The trial court ruled that Dr. Prichard could testify with respect to past crimes to the extent necessary to explain the criteria, but the explanation could not be a detailed list of what crimes Fletcher committed and when. When Dr. Prichard resumed his testimony before the jury, he simply stated what this criteria was and did not discuss why or how Fletcher met it.

Fletcher contends that Dr. Prichard's references to his criminal history and the use of the term "psychopath" constituted nonstatutory aggravation. However, we conclude that this testimony fell within permissible rebuttal. Prior to Dr. Prichard's testimony, Dr. Krop testified during direct examination that he

- 41 -

diagnosed Fletcher as having antisocial personality disorder, a "characterological or personality deficit, which we see in individuals who get into trouble at a relatively young age." Additionally, Dr. Krop testified during direct examination that to be diagnosed with antisocial personality disorder, an individual must exhibit traits of a conduct disorder as a juvenile. Dr. Krop explained that Fletcher "got into trouble at school. He's had suspensions in school. He's had behavioral outbursts in school. He started getting into the criminal system in his adolescent years. So I would say maybe goes back to [the age of] 11 or 12 . . . ." Further, during cross-examination, Dr. Krop testified that Fletcher "had a number of arrests, dating back to when he was a juvenile, including mostly grand theft, burglary or breaking-and-entering types of charges. As a juvenile, those were pretty much the preponderance of the charges for what he was arrested and, similarly, as an adult."

Because Fletcher presented evidence that he was diagnosed with antisocial personality disorder, had been suspended from school, and had a juvenile record, he opened the door to Dr. Prichard's testimony. Dr. Krop had already made the jury aware of Fletcher's long criminal history. Moreover, the use of the word "psychopath" during Dr. Prichard's testimony did not constitute evidence or argument of nonstatutory aggravation. Contrary to Fletcher's assertions, Dr. Prichard never labelled Fletcher as a psychopath in front of the jury. Although he used the words psychopath and psychopathic, he did so in explanation of the

psychopathy checklist.  As explained above, the simple use of such words is insufficient to establish error.

Accordingly, we deny relief on this claim.

Lack of Remorse

On the other hand, the trial court impermissibly allowed the State to question its expert, Dr. Prichard, as to lack of remorse.  Dr. Prichard testified that one of the criteria for antisocial personality disorder is lack of remorse:

DR. PRICHARD:  And the seventh [criteria] is lack of remorse as—

DEFENSE COUNSEL:  Objection, your honor.

COURT:  Well, that's—he can—overruled.

DR. PRICHARD:  Lack of remorse as indicated by being indifferent to or rationalizing having hurt, mistreated or stolen from another.

PROSECUTOR:  Okay.  And you felt that all seven of these applied in the defendant's case following your evaluation of him and the items you reviewed?

DR. PRICHARD:  Yes.

PROSECUTOR:  With regard to the last criteria, criteria number seven, when you're talking about rationalizing having hurt or mistreated another, rationalizing that behavior—

DR. PRICHARD:  Correct.

PROSECUTOR:  —what evidence did you see of that during your evaluation of the defendant and your review of the materials that you were provided?

As examples of rationalization, Dr. Prichard referenced two events: (1) Fletcher's explanation that he stole a four-wheeler because the keys had been left in it, and (2) Fletcher called Googe "ignorant" for fighting over $37 and the PIN for her credit card and stated she would not have been hurt had she cooperated.

Fletcher asserts that this testimony constituted nonstatutory aggravation in the form of an impermissible lack of remorse argument. We agree.

It is axiomatic that the State may not assert lack of remorse as an aggravating factor. See, e.g., Silvia, 60 So. 3d at 975; Peterson v. State, 2 So. 3d 146, 158 (Fla. 2009). While the State argued to the trial court and before this Court that lack of remorse is admissible in rebuttal to proposed mitigation based on Tanzi v. State, 964 So. 2d 106, 115 (Fla. 2007), that case is distinguishable. In Tanzi, the defendant's own mental health expert first testified on direct examination that the defendant suffered from antisocial personality disorder and that lack of remorse is a symptom of this disorder. Accordingly, based on the testimony from the defendant elicited from his own expert, the defendant opened the door to such testimony. More importantly, in Tanzi, we stressed that there was no error because the trial court instructed the jury not to consider lack of remorse and the State did not present any testimony regarding Tanzi's lack of remorse for the murdered victim.

Here, Fletcher did not open the door to lack of remorse evidence by calling

an expert who testified generally that Fletcher suffered from antisocial personality

disorder. This Court has repeatedly held that a diagnosis of antisocial personality

disorder does <u>not</u> permit this type of testimony. Specifically, in <u>Atwater v. State</u>,

626 So. 2d 1325, 1328 (Fla. 1993), this Court stated that a trial court "err[s] in

permitting the State on cross-examination to ask [the defense's expert] whether

persons with antisocial personality showed remorse." <u>See also</u> <u>Peterson</u>, 2 So. 3d

at 158 (holding that "the State ordinarily may not present evidence or argument

about a defendant's lack of remorse in the context of discussing a diagnosis of

antisocial personality disorder"). In fact, this Court actually recognized this

holding favorably in <u>Tanzi</u>, but found the situation to be different because the

defendant himself elicited this information.

Similarly, in <u>Silvia</u>, 60 So. 3d at 975, defense counsel asked the State's

mental health expert whether there were "other criteria of these antisocial

personality disorders that you observed in [the defendant]?" The expert responded,

"Limited remorse. Not much remorse for what has happened or what has been

done." <u>Id.</u> (emphasis omitted). While the trial court struck this response from the

record and instructed the jury to disregard this exchange, the trial court denied the

defendant's motion for mistrial. <u>Id.</u> This Court held that, even under

circumstances involving testimony concerning antisocial personality disorder,

"there is no question that lack of remorse is an improper aggravator" but affirmed the denial of the motion for mistrial because such mistrial "should only be granted when an error is so prejudicial as to vitiate the entire trial." Id. at 976 (quoting England v. State, 940 So. 2d 389, 401-02 (Fla. 2006)).

In this case, the trial court erroneously permitted the State to question its own expert on lack of remorse. However, improper questions regarding lack of remorse may be harmless error. See Atwater, 626 So. 2d at 1328 (holding that a question as to whether an individual with antisocial personality disorder shows remorse was harmless error).

Here, Dr. Krop, the defense expert, had already testified during cross-examination without objection that a criteria of antisocial personality disorder was lack of remorse. Additionally, while the State's expert, Dr. Prichard, was also asked about Fletcher's "lack of remorse," the prosecutor later characterized the last criteria of antisocial personality disorder as rationalization and did not emphasize the phrase "lack of remorse." Importantly, the prosecutor did not argue a lack of remorse during closing statements.

The trial court considered Fletcher's remorse to be a mitigating factor, and assigned it some weight. We conclude that, although error, the error was harmless beyond a reasonable doubt. See State v. DiGuilio, 491 So. 2d 1129, 1135 (Fla. 1986). There was no reasonable possibility that the reference in Dr. Pritchard's

testimony to lack of remorse contributed to the jury's sentencing recommendation or to the judge's sentence of death. Nevertheless, we caution the State to take precautions to prevent a reoccurrence of this problem that arises when a defendant permissibly offers a diagnosis of antisocial personality disorder as a mitigating circumstance. As we have stated, this type of evidence in itself does not open the door to the State rebutting the testimony with questions about lack of remorse as a feature of the disorder. However, because the trial court's error in permitting this type of testimony was harmless beyond a reasonable doubt, we deny relief on this claim.

## Penalty-Phase Closing Statements

Fletcher asserts that several remarks made by the prosecutor during the penalty-phase closing statements entitle him to resentencing. No objections were made to the allegedly improper statements, and therefore they are reviewed for fundamental error. Mosley, 46 So. 3d at 519. Further, we note that attorneys are generally afforded wide latitude while presenting closing statements to the jury. See Moore v. State, 701 So. 2d 545, 551 (Fla. 1997) (citing Breedlove v. State, 413 So. 2d 1, 8 (Fla. 1982)).

### Lack of Remorse

The prosecutor made the following remarks during his closing statement:

> The question today is what is the appropriate sentence for that brutal, senseless and heinous crime.

What is the appropriate sentence for someone who has the capacity to wake up an elderly woman from her sleep, to rob her and murder her?

What is the appropriate sentence for someone who murders someone who was essentially his step-grandmother?

What is the appropriate sentence for someone who, just three days after her murder, refers to her with—by terms such as bitch, ignorant, dumb-ass?

What is the appropriate sentence for that person?

What is the appropriate sentence for someone who, rather than recognizing the heinous crime that they have committed, instead blames the victim and says—essentially says that it is her fault, that if she had not fight—fought them, that she—they would have left her alone.

Is the appropriate sentence for that person life? No.

The appropriate sentence in this case is death.

(Emphasis supplied.) Fletcher contends that the underlined portion of the above question constituted a lack of remorse argument.

However, the prosecutor never asserted during his closing statement that Fletcher lacked remorse for his crime. The statement includes no references to remorse or any other term that alludes to remorse. The remark was made at the beginning of the statement, when the prosecutor had not yet begun to discuss aggravation or mitigation. The remark simply related to what an appropriate sentence would be in the context of the facts of the case. Accordingly, we deny this claim.

## Nonstatutory Aggravation

Fletcher next contends that the previous statement regarding what the appropriate sentence is for a person who committed the acts Fletcher committed

was an improper request for the jury to consider nonstatutory aggravating circumstances. However, almost immediately following the challenged remarks, the prosecutor explained that the judge would instruct the jury on how to make a decision regarding the advisory sentence, and that the jury would weigh aggravating factors and mitigating factors. Further, the prosecutor later explained that there were only three aggravating circumstances for the jury to consider. Accordingly, we deny relief on this claim.

<u>Denigration and Conversion</u>

Fletcher next challenges the following portion of the prosecutor's closing statement:

> Number three, the defendant has suffered from a chronic addition to drugs in the past. I submit to you a lot of people have drug addictions. Most of them do not murder other people.
> Number four, the defendant is depressed. A lot of people are depressed, but they don't go and murder other people.
> . . . .
> The defendant—number six, the defendant has witnessed his mother being physically abused by his father.
> Now there's a lot of people who come from tough circumstances, abusive families, but they, too, most of them, do not go and murder other people.
> . . . .
> You will also hear the mitigation that will be presented to you that the defendant has artistic ability.
> A lot of people have artistic ability. You could ask why wasn't he putting it to good use?
> A lot of people have artistic ability, but they don't murder other people.

Fletcher contends that these comments improperly denigrated the mitigation evidence and converted mitigation into aggravation.[8]

As to denigration, although a prosecutor may not improperly denigrate or attempt to invalidate mitigation evidence by characterizing it as an "excuse," "flimsy," or "phantom," the prosecutor may comment on the validity of the mitigation evidence and assert that it should be afforded less weight. Delhall, 95 So. 3d at 167-68. In doing so, the prosecutor may remark on the evidence produced during trial and rebut the closing statements of the defense, as long as such comments are a fair representation of what was presented. Id. at 168.

In Delhall, the prosecutor labelled the mitigation evidence presented as excuses, and the objections by the defense were overruled. Id. at 167. The prosecutor in Delhall made several other improper statements, to the point that the trial judge admonished her. Id. at 170. This Court held that the comments labelling the mitigation as excuses were improper, and further held that the numerous improper prosecutorial comments made during penalty-phase closing statements denied the defendant a fair trial. Id. at 167.

---

8. Fletcher also asserts that the comments were irrelevant. However, he provides no explanation as to why the prosecutor's discussion of the mitigation evidence was irrelevant, and therefore we do not address this claim. See Heath, 3 So. 3d at 1029 n.8.

Similarly, in <u>Brooks v. State</u>, 762 So. 2d 879, 903 (Fla. 2000), the prosecutor remarked during closing statements:

> I submit to you, don't do that; follow the law, do your duty. Weigh everything all out. When you do, you will see that the aggravating circumstances create a powerful case for a recommendation of [death]. They are not outweighed by those flimsy, I would submit to you, phantom, mitigating circumstances.

This Court held that the comments were improper. <u>Id.</u> at 904. Like in <u>Delhall</u>, the prosecutor's statements in <u>Brooks</u> were not intended to persuade the jury that the proffered mitigation was not mitigating in nature, or should be given only little weight. Rather, the prosecutor specifically characterized mitigation evidence with negative terms, and by doing so, sought to demean the mitigation.

Here, the prosecutor did not contend that the mitigating circumstances presented were invalid or excuses, and his remarks are not comparable to those made in <u>Delhall</u> or <u>Brooks</u>. He did not characterize the mitigation evidence in a negative way. Rather, the statements by the prosecutor addressed the weight that the jury should assign to these mitigating circumstances.

Fletcher additionally contends that the prosecutor impermissibly denigrated the mitigation when he asked the jury to compare the choices of law-abiding people with the choices of Fletcher. Fletcher relies on <u>Hayward v. State</u>, 24 So. 3d 17, 41 (Fla. 2009), in which the prosecutor commented on the life choices of the victim, admitted as victim-impact evidence, and then compared the choices made

by the defendant with those of the victim. This Court explained that victim impact evidence is admissible only to demonstrate the individuality of the person and the loss to the community. Id. As a result, this Court held that a prosecutor may not ask the jury to compare the life choices of the victim with the life choices of the defendant. Id. We reiterated this proscription in Wheeler v. State, 4 So. 3d 599, 611 (Fla. 2009).

Hayward and Wheeler address the improper juxtaposition of the life of the victim with that of the defendant through the use of victim impact evidence. Although a victim impact statement was presented to the jury in this case, the prosecutor did not ask the jury to compare the life of Googe to the life of Fletcher. Neither Hayward nor Wheeler stands for the proposition that a prosecutor cannot make broad statements that other people in the community with the same background or characteristics as the defendant do not commit murder. Therefore, we deny relief on this claim.

Finally, Fletcher asserts that the prosecutor improperly converted mitigating circumstances into aggravating circumstances by attaching aggravating labels to mitigation evidence. Fletcher does not elaborate as to how the closing statement by the prosecutor attached an aggravating label to any mitigating circumstances. This Court has previously held that a trial court did not abuse its discretion in overruling an objection to the prosecutor's statement that the defendant's loving

family environment appeared mitigating, but was the most aggravating factor of all.  Moore, 701 So. 2d at 551.  The remarks by the prosecutor in this case do not even directly characterize any of the mitigating circumstances as aggravating.  Accordingly, we conclude that this challenge is without merit.

Cumulative Effect

Fletcher contends that the cumulative effect of the improper statements by the prosecutor during closing statements amounted to fundamental error.  Because we conclude that none of the remarks made by the prosecutor were improper, we deny relief on this basis.  See Mendoza v. State, 87 So. 3d 644, 657 (Fla. 2011).

**Sentencing Order**

Fletcher next asserts that he is entitled to a new penalty phase because: (1) the aggravating circumstance of a contemporaneous conviction is an impermissible automatic aggravator, and the aggravating circumstance did not warrant great weight; (2) the aggravating circumstance that Fletcher committed the murder while under a sentence of imprisonment did not warrant great weight; (3) the trial court improperly found the HAC aggravating circumstance; (4) the trial court improperly rejected the mitigating circumstance that Fletcher has been treated for bipolar

disorder;[9] and (5) the trial court did not properly assess the mitigating

circumstances, each of which warranted great weight.[10]

Contemporaneous Robbery

This Court has repeatedly held the claim that a contemporaneous robbery

constitutes automatic aggravation to be without merit, and, accordingly, we deny

this claim. See, e.g., Miller v. State, 926 So. 2d 1243, 1260 (Fla. 2006); see also

Blanco v. State, 706 So. 2d 7, 11 (Fla. 1997).

Fletcher also asserts that the contemporaneous robbery aggravator should

have been afforded little weight because the prosecution heavily relied on a felony

murder theory, and there was little to no evidence with respect to premeditation.

The weight assigned to an aggravating circumstance is reviewed for abuse of

discretion. Sexton v. State, 775 So. 2d 923, 934 (Fla. 2000). If a reasonable

person could reach the conclusion made by the trial court, then discretion has not

been abused. Huff v. State, 569 So. 2d 1247, 1249 (Fla. 1990).

---

9. Fletcher asserts that the trial court made no finding with respect to the mitigating factor that he suffers from attention deficit disorder, attention deficit hyperactivity disorder, or a mood disorder. This mitigating factor was not presented to the trial court, and therefore the trial court's failure to find this mitigating circumstance cannot be challenged on appeal. See Lucas v. State, 568 So. 2d 18, 24 (Fla. 1990).

10. Fletcher also disagrees with the finding by the trial court that he committed the murder. The sufficiency of the evidence with respect to the murder conviction is addressed under a separate heading below.

Fletcher relies on Scott v. State, 66 So. 3d 923, 937 (Fla. 2011), in which this Court vacated the death sentence as disproportionate due, in part, to the lack of evidence of premeditation, as well as the presence of minimal aggravation. The trial court found only two aggravating circumstances—contemporaneous violent felony and commission during an attempted armed robbery—and assigned both great weight. Id. at 935. The contemporaneous felony aggravating factor arose from the fact that the defendant struck an individual with the butt of his gun before he shot the victim. Id. This Court noted that although the aggravated assault qualified as a prior violent felony, it involved a relatively limited use of violence, was charged only on the eve of trial, and was qualitatively different from the circumstances in other cases in which the death penalty was imposed. Id. at 937.

Thus, although in Scott the Court determined that the contemporaneous felony aggravating circumstance did not weigh as heavily in that case, this was due to the circumstances of the underlying offense. See id. at 937 ("Furthermore, the prior violent felony aggravator [in Scott] . . . is qualitatively different than in cases where this Court has affirmed the death penalty when similar aggravators were considered and the prior violent felony aggravator was based on a contemporaneous act." (emphasis omitted)). Nowhere in Scott did this Court suggest that a contemporaneous felony could never be given great weight as an aggravating circumstance.

Accordingly, we hold that the trial court did not abuse its discretion in affording great weight to the contemporaneous felony aggravating factor.

Sentence of Imprisonment

Fletcher also asserts that the aggravating circumstance that the murder was committed while he was under a sentence of imprisonment did not warrant great weight because the crimes for which he was imprisoned were property crimes. Fletcher relies on Snelgrove v. State, 107 So. 3d 242, 250 (Fla. 2012), in which the trial court gave little to some weight to the aggravating circumstance that the defendant was on community control for the felony of tampering with physical evidence. The defendant contended that this aggravating factor should have been given even less weight because the offense was non-violent and did not merit a prison sentence. Id. at 258. Because the trial court gave this factor only little to some weight based on this very consideration, this Court held that the trial court did not abuse its discretion. Id.

Here, the trial court found the State had established beyond a reasonable doubt that Fletcher was serving concurrent ten-year sentences for four separate burglary charges. Therefore, it necessarily considered the nature of the underlying offenses in assigning this aggravating circumstance great weight. Unlike in Snelgrove, in which the defendant was on community control, Fletcher's sentences merited a punishment of ten years' incarceration. Moreover, although the offenses

were property crimes, Fletcher was lawfully incarcerated at the time of the murder, and planned and executed several additional property crimes upon his escape. Accordingly, we hold that Fletcher has not established that the trial court abused its discretion in affording this aggravating circumstance great weight.

HAC

This Court will not overturn the finding of an aggravating circumstance where it is supported by competent, substantial evidence. See, e.g., Guardado v. State, 965 So. 2d 108, 115 (Fla. 2007). This Court does not reweigh the evidence to determine whether each aggravating circumstance was proven beyond a reasonable doubt. See Aguirre-Jarquin v. State, 9 So. 3d 593, 608 (Fla. 2009).

Fletcher asserts that because the medical examiner who conducted the autopsy could not rule out the possibility that Googe was unconscious at the time she was strangled, there is reasonable doubt as to whether Googe was conscious. The HAC aggravator may not apply where a victim was unconscious when strangled. See DeAngelo v. State, 616 So. 2d 440, 443 (Fla. 1993).

However, the medical examiner who testified during trial stated that it was his opinion that Googe was conscious at the time of the strangulation because there was no significant trauma to Googe's head that would cause a loss of consciousness. The trial court recognized this evidence in its sentencing order, and additionally noted that it was consistent with Fletcher's statement that Googe

fought against him and Brown. Additionally, these events occurred over a prolonged period of time. Prior to the fatal strangulation, Googe was confronted in her bed in the middle of the night by two men, threatened with a firearm, struck, and choked. She screamed that she was frightened at least four times. Accordingly, we conclude that competent, substantial evidence supports the finding of the HAC aggravator. See Barnhill v. State, 834 So. 2d 836, 850 (Fla. 2002) ("Because strangulation of a conscious victim involves foreknowledge and the extreme anxiety of impending death, death by strangulation constitutes prima facie evidence of HAC.").

### Mitigating Circumstances

The finding of whether a mitigating circumstance has been established is a question of fact that will not be overturned where it is supported by competent, substantial evidence. Blanco, 706 So. 2d at 10. With respect to nonstatutory mitigating circumstances, the trial court must determine whether the circumstance is truly of a mitigating nature. Allen v. State, 137 So. 3d 946, 967-68 (Fla. 2013).

Fletcher asserts that the trial court improperly rejected the mitigating circumstance that Fletcher had been treated for bipolar disorder. However, the record demonstrates that no symptoms of bipolar disorder were observed by the defense mental health expert, the State mental health expert, or a doctor with whom the State mental health expert consulted who had previously provided

psychological treatment to Fletcher. No reason was indicated for the notation of bipolar disorder in Fletcher's records, and none of the medications that have been prescribed to Fletcher during his lifetime are used to treat bipolar disorder. The State mental health expert testified that bipolar disorder will manifest if not treated by medication. Accordingly, we hold that competent, substantial evidence supports the rejection of the mitigator.

Fletcher also asserts that the mitigating circumstances provided by the defense should have been accorded great weight. However, he provides no legal basis for this assertion. With respect to Fletcher's drug addiction, he asserts that the trial court downplayed this mitigating circumstance by referring to it as a "disease of choice," and additionally disregarded that this was a form of self-medication. However, no legal basis is provided for this assertion, and this challenge constitutes nothing more than a disagreement as to the appropriate weight of this factor. Fletcher makes similar assertions with respect to the mitigating circumstances that he came from a dysfunctional family and that as a child he witnessed his father physically abuse his mother. Simple disagreement with the weight given by the trial court is not a basis for relief, so we deny these claims. See Blackwood v. State, 777 So. 2d 399, 409 (Fla. 2000).

Fletcher also asserts that the trial court mistakenly ascribed his depression to be the result only of his incarceration, and did not take into consideration that he

was diagnosed with depression during his childhood. However, the sentencing order specifically states that both mental health experts testified that Fletcher suffered from depression throughout his life. Thus, this claim is without merit.

Additionally, Fletcher asserts that the trial court impermissibly required that several mitigating factors have a nexus to the crime, including: (1) Fletcher has been treated for PTSD (slight weight); (2) Fletcher previously attempted suicide (little weight); and (3) Fletcher's mother died of cancer when he was eighteen (little weight). With respect to the PTSD diagnosis, the trial court found that Fletcher did not suffer from PTSD at the time of the murder. With respect to the two other mitigating circumstances, the trial court found that they had little significance to the murder.

Although a trial court cannot require a nexus between the crime and mitigating evidence, the court may place mitigating evidence in context. See Martin v. State, 107 So. 3d 281, 318 (Fla. 2012). This Court explained in Cox that although mitigating evidence cannot be dismissed, the trial court may assign weight based on the context of the mitigating circumstance. 819 So. 2d at 723. In Cox, the trial court gave no weight to the mitigating factor that the defendant suffered from heightened anxiety when interacting with other people because there was no evidence that this anxiety contributed to any decisions made by the defendant or the actions that led to the murder. Id. at 723 n.15. This Court held

that the assignment of no weight was not an abuse of discretion because the record contained no evidence that the mitigating circumstance was relevant to the case. Id. at 723.

Cox establishes that the trial court may consider the connection or relationship between the mitigating circumstance and the murder. The challenged explanations given by the trial court in the sentencing order here are substantially similar to the explanation given in Cox—the trial court placed the mitigating circumstance in context and assigned weight on that basis. Accordingly, we hold that the trial court did not improperly require a nexus.

Fletcher further asserts that the trial court converted the mitigating circumstance that he received his GED while incarcerated into an aggravating circumstance because the trial court noted that this "proves he is capable of focusing on a task," and "the nature and sophistication of this very crime shows [Fletcher] has the ability to focus on a task and achieve a goal . . . ." This claim is unsupported by the sentencing order, which assigned some weight to this mitigating circumstance.

These comments by the trial court simply explained why the mitigating circumstance warranted only some weight. A trial court does not abuse its discretion when it explains why a proposed nonstatutory mitigating factor is not truly mitigating or warrants little weight. Cf. Trease v. State, 768 So. 2d 1050,

- 61 -

1055 (Fla. 2000) ("We therefore recognize that while a proffered mitigating factor may be technically relevant and must be considered by the sentencer because it is generally recognized as a mitigating circumstance, the sentencer may determine in the particular case at hand that it is entitled to no weight for additional reasons or circumstances unique to that case."). Thus, we deny this claim.

Based on the foregoing, we hold that the trial court fulfilled its obligation to address each mitigating circumstance offered by the defendant, did not improperly reject any mitigating circumstance, and did not abuse its discretion in assigning weight to any of the mitigating circumstances.

## Constitutionality

Fletcher alleges that Florida's capital sentencing scheme is unconstitutional under Ring v. Arizona, 536 U.S. 584 (2002). We have previously held that Ring does not apply when the aggravating circumstance that the defendant committed the murder while under a sentence of imprisonment is applicable. See Hodges v. State, 55 So. 3d 515, 540 (Fla. 2010). We acknowledge that the United States Supreme Court has granted certiorari to review our decision in Hurst v. State, 147 So. 3d 435 (Fla. 2014), cert. granted, Hurst v. Florida, 135 S. Ct. 1531 (2015), and framed the issue to be decided in that case as follows: "Whether Florida's death sentencing scheme violates the Sixth Amendment or the Eighth Amendment in light of this Court's decision in Ring v. Arizona, 536 U.S. 584 (2002)." 135 S. Ct.

at 1531. Unlike this case, however, <u>Hurst</u> did not involve the under-sentence-of-imprisonment aggravator, which this Court's precedent clearly establishes does not implicate <u>Ring</u>. Accordingly, until the Supreme Court issues a contrary decision, Fletcher's claim is without merit under established Florida precedent.

Fletcher raises several additional subclaims under this issue, which we have also repeatedly held to be without merit. <u>See</u> <u>Franklin v. State</u>, 965 So. 2d 79, 97 (Fla. 2007) (rejecting the claim that victim impact evidence may not be presented to the jury); <u>Griffin v. State</u>, 866 So. 2d 1, 14 (Fla. 2003) (rejecting the claim that the standard jury instructions do not properly instruct the jury on consideration of mitigating and aggravating factors); <u>Porter v. Crosby</u>, 840 So. 2d 981, 986 (Fla. 2003) (rejecting the claim that aggravating circumstances must be charged in the indictment, and the claim that each aggravating circumstance must be individually found); <u>Card v. State</u>, 803 So. 2d 613, 628 (Fla. 2001) (rejecting the claim that the HAC aggravating circumstance is vague and overbroad); <u>Blanco</u>, 706 So. 2d at 11 (rejecting the claim that Florida's capital sentencing statute is unconstitutional because every person convicted of first-degree felony murder automatically qualifies for the circumstance of commission during an enumerated felony).

**Cumulative Error**

Fletcher asserts that the cumulative effect of guilt-phase and penalty-phase errors renders the convictions and the death sentence fundamentally unfair.

However, because we hold that only one error occurred during the guilt phase, and no errors occurred during the penalty phase, no cumulative error analysis is necessary, and we deny this claim.  See Pagan, 830 So. 2d at 815.

**Proportionality**

To ensure uniformity in the application of the death sentence, this Court performs a comprehensive review of each case in which the death sentence is imposed to determine whether the crime is among both the most aggravated and the least mitigated of murders.  Williams v. State, 37 So. 3d 187, 205 (Fla. 2010). We examine the totality of the circumstances of the case and compare them to other capital cases.  Id.  Our review entails a qualitative, rather than a quantitative, analysis of the basis for each aggravating and mitigating circumstance.  Id.

Precedent supports the death sentence as a proportionate punishment in this case based on the nature of the three aggravating circumstances.  See Kopsho v. State, 84 So. 3d 204, 210-11, 220 (Fla. 2012) (holding death sentence proportionate where four aggravating circumstances—including under sentence of imprisonment or on felony probation, prior violent felony, murder committed during armed kidnapping, and the murder was cold, calculated, and premeditated— were weighed against no statutory mitigating circumstances and fourteen nonstatutory mitigating circumstances); see also Ocha v. State, 826 So. 2d 956, 960, 966 (Fla. 2002) (holding death sentence proportionate where defendant hung

victim and where the aggravators of prior violent felony and HAC were weighed against thirteen nonstatutory mitigating circumstances, including history of suicidal thoughts, artistic ability, history of drug and alcohol abuse, PTSD, violent childhood, and remorse).  Additionally, the HAC aggravator is among the weightiest of the aggravating circumstances.  See Johnson v. State, 969 So. 2d 938, 958 (Fla. 2007).

This case is distinguishable from those relied on by Fletcher for the assertion that the death penalty is disproportionate.  In four of the five cases relied on by Fletcher, the defendant was under eighteen years old, and age was a significant mitigator.  See Urbin, 714 So. 2d at 417 (seventeen-year-old defendant); Curtis v. State, 685 So. 2d 1234, 1237 (Fla. 1996) (same); Morgan v. State, 639 So. 2d 6, 14 (Fla. 1994) (sixteen-year-old defendant); Livingston v. State, 565 So. 2d 1288, 1292 (Fla. 1988) (seventeen-year-old defendant).  Because the United States Supreme Court has since held that the death sentence cannot be imposed on individuals for crimes committed under the age of eighteen, these cases are inapplicable.  See Roper v. Simmons, 543 U.S. 551, 568 (2005).  Moreover, this case is not comparable to Cooper v. State, 739 So. 2d 82, 86 (Fla. 1999), in which the defendant was only eighteen, suffered a brutal childhood, had brain damage, suffered from mental retardation and paranoid schizophrenia, and had no prior criminal record.

Fletcher was twenty-five years old at the time of the murder. The trial court found that Fletcher's

> level of maturity and intelligence with regard to the planning of this crime is of most significance. In his April 18, 2009, confession, [Fletcher] described, in vivid detail, his involvement in these crimes, minimizing only his role in the actual murder of Helen Googe. His age, if a factor at all, played little if any role in mitigating his involvement in this offense.

The trial court recognized that a sentencing court may decline to find age as a mitigating circumstance where the defendant is twenty-five years old at the time of the murder. Accordingly, the trial court gave the age factor little weight.

Moreover, Fletcher is of average intelligence, functions in the top 40% of the population, and has no brain damage. As such, we conclude that Fletcher's age at the time of the murder does not render the death sentence disproportionate.

Further, we hold that the death sentence is not disproportionate, even though codefendant Brown received a life sentence. The trial court gave great weight to Brown's life sentence, but imposed the sentence of death because it found that Fletcher was the mastermind of the plan and committed the actual murder. Fletcher had a relationship with Googe, resented Googe, knew Googe's financial status, and knew how to enter Googe's house. Fletcher's DNA, and not Brown's, was found under Googe's fingernails. The death penalty is not disproportionate even where a codefendant received a life sentence if the defendant who received the death sentence is more culpable. See Wright v. State, 19 So. 3d 277, 305 (Fla.

- 66 -

2009) (holding the death sentence proportionate despite codefendant's sentence of life).

Based on the above, we hold that the death sentence is not disproportionate in this case.

**Sufficiency**

This Court has a mandatory obligation to independently review the sufficiency of the evidence in each case that imposes the death sentence. <u>See</u> <u>Blake v. State</u>, 972 So. 2d 839, 850 (Fla. 2007); Fla. R. App. P. 9.142(a)(5). The Court views the evidence in the light most favorable to the State to determine whether a rational trier of fact could have found beyond a reasonable doubt the existence of the elements of the crime. <u>Bradley v. State</u>, 787 So. 2d 732, 738 (Fla. 2001).

Fletcher was convicted of first-degree murder, escape, two counts of burglary, two counts of grand theft, and home invasion robbery. His post-arrest statement includes admissions to each of the crimes except the actual strangulation of Googe. Further, during his post-arrest statement, he bragged that he was the only inmate with enough nerve to escape from prison, and boasted about his driving skills when he explained why he, rather than Brown, drove the stolen vehicles. The record also contains evidence that Fletcher, who was the mastermind of the plan to escape from jail and rob Googe, was the actual killer. He knew

Googe's address, how to enter her house, where she was likely to place money for safekeeping, and her financial status. Additionally, the record contains evidence that Fletcher resented Googe, and his DNA was found under Googe's fingernails. Although Fletcher asserts that Brown committed the murder, Brown did not have a relationship with Googe, and his DNA was not found on Googe's body. We conclude that the record contains sufficient evidence from which a jury could have convicted Fletcher of the crimes, including the first-degree murder of Googe.

## CONCLUSION

Based on the foregoing, we affirm Fletcher's convictions and his sentence of death.

It is so ordered.

LABARGA, C.J., and PARIENTE, QUINCE, and PERRY, JJ., concur.
LEWIS, CANADY, and POLSTON, JJ., concur in result.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

An Appeal from the Circuit Court in and for Putnam County,
    Wendy Williams Berger, Judge - Case No. 542009CF000648CFAXMX

Jose Rafael Rodriguez of the Law Offices of J. Rafael Rodriguez, Miami, Florida,

    for Appellant

Pamela Jo Bondi, Attorney General, Tallahassee, Florida; and Stacey Elaine Johns Kircher, Assistant Attorney General, Daytona Beach, Florida,

    for Appellee