# Supreme Court of Florida

————————

No. SC13-2393

————————

**STEVEN ANTHONY COZZIE**,
Appellant,

vs.

**STATE OF FLORIDA**,
Appellee.

[May 11, 2017]

PER CURIAM.

Steven Anthony Cozzie appeals his conviction for first-degree premeditated or felony murder with a weapon and his sentence of death. For the reasons below, we affirm.[1]

## BACKGROUND

The evidence presented at trial established that, on June 13, 2011, the victim, 15-year-old Courtney Wilkes, and her mother, father, and two younger siblings arrived in Seagrove Beach in Walton County for a family vacation. On the first

---

1. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const.

day of their stay, several members of the Wilkes family encountered the defendant, 21-year-old Steven Cozzie, at the beach outside their condominium. Courtney's mother testified that, at the time, she believed Cozzie worked for the company that provided the condominium's beach chairs and umbrellas because he offered to put away all the other beach chairs before theirs. In the two days that followed, Mrs. Wilkes testified to seeing Cozzie around the beach but to having no conversations with him or seeing him with any of her children.

On June 16, 2011, the day before they were scheduled to return home to Georgia, the entire Wilkes family spent time together at the beach. After lunch, Courtney "bounced over" to where her parents were sitting and asked permission to go on a walk with Cozzie. Believing that Cozzie was in the same age group as their daughter, Courtney's parents gave her permission. At approximately 1:15 p.m., Mr. and Mrs. Wilkes watched their daughter walk with Cozzie eastward along the shore, lost sight of them after a few minutes, and never saw Courtney alive again.

The Wilkes reported Courtney missing that same day after their independent search for her failed. Within hours, Michael Spencer, a friend of Cozzie's, alerted police that Cozzie had told him he killed the missing girl and that Cozzie had also taken him to see her body. Spencer then led sheriff's deputies to the body at the Cassine Gardens Nature Trail, and Cozzie was arrested that same evening.

At Cozzie's 2013 trial, Spencer testified that, in the days leading up to Courtney's murder, Cozzie talked to him about "[r]aping and killing underage girls and women his own age," including how "[Cozzie] would want to tie them up and just practically rape them and then kill them. . . .  Because you just raped somebody's daughter or somebody's mother, why not kill them."

Spencer testified that, at the time, he thought Cozzie was only describing fantasies.  However, on the day of Courtney's murder, Spencer said that Cozzie came to see him at the apartment where he was staying that summer and told Spencer, "I just killed this chick."  Spencer testified that he did not believe Cozzie at first, but after they left the apartment, rather than head toward the beach, Cozzie led him to the nature trial where he said he had killed the girl.

Spencer testified that, once they got to the nature trail, Cozzie pointed out a disturbed area in the pine straw at the end of the wooden boardwalk and said, "I wrestled with her for like 20 minutes right there."  Then, Spencer testified that Cozzie took him several yards off the boardwalk to see the body, which was on the other side of a fallen tree.  Spencer further testified that the victim's body was nude, a bloody blue shirt was covering her head, and he could tell she was not breathing.  Spencer said that Cozzie picked up the shirt and threw it into the bushes, and with the shirt removed, he saw that the victim's hair was bloody, and "[i]t looked like there was a hole" in her head.

Spencer also testified to details Cozzie told him about the murder on the way to the nature trail and in the few minutes they were at the scene. Specifically, Cozzie told Spencer that he met the girl on the beach and took her for a walk, but when they arrived at the nature trail, she turned around to go back, and Cozzie "strangled her with his shirt, then with her shirt, then with his bare hands; he stomped on the back of her neck and then found some sort of piece of wood and bashed her head in repeatedly."

Spencer further testified to things Cozzie told him he said and thought during the attack. For example, Spencer said Cozzie told him "that he was yelling at [the victim] for her to take her clothes off" and further described his thoughts as he picked up the piece of wood he used to beat the victim: "I stood there next to her and looked at the piece of wood; do you want to use the flat end or the side; the flat end or the side. And then . . . I said f*ck it and just started hitting her in the head with the side of it. . . . Bam, bam; I bashed her head in like ten times with it."

The medical examiner testified that the cause of death was from the combined effects of blunt impact to the head and strangulation. She further testified to the victim's numerous injuries, including: Skull fractures were visible through a laceration in the scalp, and the victim's skull had been shattered into 16 pieces in a 5-inch-by-five-inch area by at least two (but probably more) blows to the head. There were large scratches on the victim's neck extending down to the

upper chest, and injuries to the shoulder that appeared to be from glancing blows that missed the victim's head. A splinter was pulled from the wound overlying the skull fractures, and the head injuries were consistent with having been inflicted by a wooden piece of lumber or a piece of a tree.

The medical examiner further testified that the victim had been choked or strangled with force extreme enough to bruise her esophagus. The strangulation was more consistent with ligature strangulation, and could have been from a bikini top or a shirt, and there was bruising on the inner lips indicating some type of smothering. There were mirror-image abrasions to the inside of both of the victim's inner thighs that were consistent with hip bones thrusting into the thigh area. The outer labia had abrasions or scrapes caused by a penis, finger, or some type of instrument that caused blunt or frictional force; these injuries were consistent with contact to the vagina and definitely showed contact to the labia. Vertically oriented abrasions on the victim's back and buttocks were consistent with being dragged, and numerous contusions and abrasions on the victim's body looked like they could have been made by rolling around on the ground. There were no markings on the back of the victim's neck consistent with the claim that it had been stomped, and there were no defensive injuries of note; however, all of the injuries were caused prior to death, and one of the victim's hands was bloody, which indicated that it was probably near one of her injuries.

No semen was found in the victim's rape kit or in swabs taken from her thighs. However, DNA analysis linked Cozzie to numerous items recovered at the scene, including the victim's bikini bottoms, sunglasses on which the victim's blood was found, a blue multi-colored shirt on which the victim's blood was found, and a swab from the victim's left thigh. DNA testing also excluded Spencer as a contributor to all items tested, except for one item for which there was not enough DNA present to exclude or include anyone. The victim's DNA matched a swab taken from under Cozzie's fingernail at 12 of 13 genetic markers. Blood on a cut piece of lumber recovered from a pile of wood between the victim's head and the fallen log behind which her body was located matched the victim's DNA.

Prior to trial, Cozzie (who did not testify during any phase of the proceeding) gave two statements to police. In the first, he denied that he did anything other than walk with Courtney and denied that he took Spencer to see her body. In the second, Cozzie said that Courtney fell and hit her head and was rendered unconscious, he went and got Spencer for help, and Spencer forced him to kill Courtney at gunpoint. The jury heard recordings of both of these interviews. However, just prior to closing argument, defense counsel notified the trial court that Cozzie intended to concede that he killed Courtney as part of a strategy to argue for the lesser-included offense of second-degree murder. During his closing arguments, defense counsel acknowledged that Cozzie killed Courtney and that it

- 6 -

was unlawful to do so and further argued that Cozzie had told a "tale that Michael Spencer made him do it," but that Spencer had exaggerated the details. Defense counsel asked the jury to find Cozzie guilty of second-degree murder.

On June 14, 2013, Cozzie's jury found him guilty of first-degree premeditated murder or felony murder with a weapon; sexual battery with a deadly weapon or force likely to cause serious personal injury; aggravated child abuse causing great bodily harm, permanent disability, or permanent disfigurement; and kidnapping with a weapon with intent to commit a felony.

During the penalty phase, the State presented testimony of Courtney's mother, father, and godfather as victim impact evidence. The State also presented testimony from five witnesses who testified regarding Cozzie's alleged attack on a 14-year-old girl on the same nature trail, just one week prior to Courtney's murder.

Cozzie presented penalty phase testimony from one person in support of his argument that he did not attack another girl on the nature trail. He also presented testimony from seven family members, one long-time friend, and two mental health experts, Dr. Steven Gold, a forensic psychologist, and Dr. Stephen Zieman, a clinical psychologist with a specialty in clinical neuropsychology.

Dr. Gold testified to Cozzie's deprived childhood, which included physical abuse, sexual abuse, verbal and emotional abuse, emotional and physical neglect, parental separation, homelessness, domestic violence, lack of positive role models

and structure, and being surrounded by people who may have been mentally ill and who used drugs and alcohol. Dr. Gold further testified that Cozzie has difficulty reading social cues; heard voices and experienced command hallucinations; has PTSD as a result of physical abuse and being raped by his stepbrother;[2] has a history of depression; experienced sleep disorders, dissociative reactions, and blackouts; was possibly psychotic; was probably born with deficits as a result of oxygen deprivation caused by the umbilical cord being wrapped around his neck; never developed the ability to recognize and then control his emotions; and was unable to manage the tasks of daily living and maintain interpersonal relationships.

On cross-examination, when the State sought to determine whether and how any of Cozzie's deficits may have affected him on the day of Courtney's murder, Dr. Gold testified that he was not employed "to express opinions about [Cozzie's] mental status at the time of the offense" and that he did "not have an opinion regarding [Cozzie's] mental state specifically at the time of the offense." However, Dr. Gold also testified on cross-examination that Cozzie had the capacity

---

2. Cozzie's stepbrother (who is six months younger than Cozzie) testified as a defense witness during the penalty phase and acknowledged having a sexual relationship with Cozzie when they were both children, but the stepbrother claimed it was consensual. Cozzie's half-sister, who also testified as a defense witness during the penalty phase, stated that Cozzie molested her, would cut her clothes off when she was sleeping, and that she once woke up and found Cozzie trying to anally rape her.

to appreciate the criminality of what he did to the victim and knew it was legally and morally wrong to "strangle her, sexually assault her[,] and beat her skull to bits," but stated "it's possible" that Cozzie's "compromised functioning, his dissociative or psychotic experiences may have negatively impacted his ability" to conform his conduct to the requirements of the law at the time of the murder. Dr. Gold further testified that Cozzie told him the victim made a statement which Cozzie "interpreted as indicating that he was a creep and the next thing he knew he came to finding that he was choking her." In addition, Dr. Gold testified that there were "no indicators or indications that would suggest [Cozzie] might suffer from . . . anti-social personality disorder," although he acknowledged that Cozzie met some of the criteria for the diagnosis, including failure to plan ahead and lack of remorse.

Cozzie's other mental health expert, Dr. Zieman, testified that Cozzie has an IQ of 83. Dr. Zieman further testified that "Cozzie's brain does not work in the exact same way as it should for most others his age" and identified executive functioning as Cozzie's "most difficult area." Although Dr. Zieman testified that Cozzie was intelligent enough to plan, to rape, and to know it was morally wrong and unlawful, in his opinion, Cozzie does not have "the ability to plan a multi-step plan." Dr. Zieman also testified that if Cozzie had come to him in his clinical practice, he would have recommended "a guarantor or a conservator; somebody to

help him navigate through the world because he just doesn't seem to understand the way - - the way things work in relationship to the way he thinks."

To rebut the testimony of Cozzie's mental health experts, the State called Dr. Harry McClaren, a forensic psychologist. Dr. McClaren testified that he examined Cozzie on two separate days and that there was no evidence Cozzie had bipolar disorder or schizophrenia and that Cozzie's "mental associations were firm, logical, [and] relevant." Dr. McClaren further testified that he examined Cozzie to determine his mental status at the time of the crimes and whether any of the statutory mental health mitigators applied, and, over Cozzie's objection, Dr. McClaren testified to aspects of Cozzie's factual account of the crime that he used to arrive at his opinion.

Specifically, Dr. McClaren testified that Cozzie described his attack on the victim as a reaction to something that the victim said that "made [him] feel small, pushed [him] to [his] limit, made [him] feel inadequate and angry," and testified that Cozzie told him:

> I put a shirt around her neck as she turned to walk back . . . to make her feel small. I put the ligature around her neck a lot. I knew that I couldn't control myself. I pulled it and turned it so I could pull her down, me and her went down. It was more fall[ing] to the ground. She was between my knees.
> Then I tried to rip her aqua shirt and bikini top off. I pulled it off, untied the strings. . . . I think she was passed out at that time due to my use of my shirt. Her back was bare. . . . I took off her shorts, her bathing suit and bottom. She was lying there but trying to wake up. I had both of my shoulders between her legs.

I then saw the pad and not the tampon kind but like a Kotex. So I saw blood. Then I started feeling against it as far as going down on her and raping her. I found a small board thinking she's going to wake up and know who I am at the beach. I thought I could knock her out so she wouldn't remember it.

I kind of put her shirt around her neck. She's naked. I thought I'll be in so much trouble so I took the little board and hit her twice or three times. I saw blood. I grabbed the shirt, put it across her neck, dragged her to the tree. I saw blood coming. I used my shirt to prevent the blood from going in her mouth and nose.

Before and after palm fronds were put on her [so that she could not be easily seen]. And she was still breathing when I left . . . . I didn't know what to do. However, I had known I had done an act of violence.

I went to the only person. I went two miles on a bike to his house. I told him I think I killed a girl. I was shaking. Scared. He gave me a Sprite. I told him what happened. I lost my nerve. I stripped her down and hit her due to being put down. I had been put down –

Dr. McClaren opined that "the strangling with the shirt, dragging away, covering up, [and g]oing to get help" showed that Cozzie "did not lose control of executive functioning, that he had in fact the ability to have executive thoughts and carry out those executive thoughts." In terms of a diagnosis, Dr. McClaren testified that Cozzie has paraphilia, a history of ADHD, a history of oppositional defiant disorder, and a history of learning disabilities. Dr. McClaren further diagnosed Cozzie with antisocial personality disorder, and in explaining how Cozzie met the criteria for the disorder testified (over defense counsel's objection and motion for a mistrial, but pursuant to the trial court's direction to "get on to the

- 11 -

diagnosis") that he "did not see scarcely any remorse[,] hear any expression of remorse" from Cozzie.

Dr. McClaren further testified that neither of the statutory mental health mitigators applied to Cozzie and that he believed the crime was planned rather than committed in a dissociative episode caused by Cozzie's PTSD. Dr. McClaren testified that Cozzie's alleged statements to Michael Spencer about planning to rape and kill young females as well as Cozzie's alleged assault on another young girl the week before his crimes against the victim "play[ed] into his opinion [that this was not] a post-traumatic stress disorder reaction" and "it would be more consistent with a person having these kinds of sexual fantasies, violent sexual fantasies."

Following the penalty phase presentation, on June 20, 2013, the jury recommended the death penalty by a vote of twelve to zero, and a Spencer[3] hearing was held on August 22, 2013, at which no additional witnesses testified. Thereafter, concluding that the aggravating circumstances[4] "far outweigh" the

---

3. Spencer v. State, 615 So. 2d 688 (Fla. 1993).

4. The trial court found the following aggravators, all of which it assigned great weight: (1) in the course of a sexual battery, aggravated child abuse, and kidnapping; (2) HAC; (3) CCP; and (4) avoid arrest. The jury had found Cozzie guilty as to sexual battery, aggravated child abuse, and kidnapping of Courtney Wilkes.

- 12 -

mitigating circumstances,[5] the trial court sentenced Cozzie to death in accordance

with the jury's recommendation.

## ISSUES ON APPEAL

Cozzie raises the following issues on appeal: (1) whether the trial court

erred in denying his challenges for cause against two prospective jurors; (2)

whether the trial court abused its discretion in allowing the rebuttal testimony of

the State's mental health expert; (3) whether the trial court erred in finding the

avoid arrest aggravator; (4) whether the State's penalty phase evidence became an

improper feature of the penalty phase; and (5) whether Florida's capital sentencing

scheme is unconstitutional under Ring v. Arizona, 536 U.S. 584 (2002). We also

---

5. The trial court found one statutory mitigator, namely Cozzie's age of 21, to which it assigned moderate weight, and the following 25 nonstatutory mitigators, to which it assigned weight ranging from no weight to moderate weight: (1) physical abuse (little weight); (2) emotional abuse (little weight); (3) sexual abuse (moderate weight); (4) bullying (little weight); (5) compromised social skills (slight weight); (6) low-average IQ of 83 (moderate weight); (7) neurological deficits (little weight); (8) physical neglect (no weight); (9) emotional neglect (little weight); (10) parental abandonment (slight weight); (11) divorced parents (no weight); (12) family history of drug abuse (no weight); (13) poor role models (no weight); (14) lack of sound reasoning and judgment (little weight); (15) transient lifestyle (little weight); (16) homelessness (no weight); (17) lack of stability (slight weight); (18) lack of psychological care (moderate weight); (19) depression (little weight); (20) saved the lives of two children (little weight); (21) devoted uncle (slight weight); (22) good with animals (no weight); (23) capable of maintaining loving relationships (slight weight); (24) told by family members that he was once "possessed" and had been abducted by aliens (no weight); and (25) worked outside the home and there are no examples of extraordinarily poor conduct in the workplace (slight weight).

review whether the evidence is sufficient to support Cozzie's conviction and whether his death sentence is proportionate. As explained below, none of these issues warrants relief.

## 1. Cause Challenges

Cozzie first argues that the trial court erred by denying his cause challenges to prospective jurors Neece and Bishop-Avery, a claim which the State argues Cozzie failed to preserve. We disagree with both Cozzie and the State.

This Court has held that "to preserve challenges for cause to prospective jurors, the defendant must 'object to the jurors, show that he or she has exhausted all peremptory challenges and requested more that were denied, and identify a specific juror that he or she would have excused if possible.' " Matarranz v. State, 133 So. 3d 473, 482 (Fla. 2013) (quoting Kearse v. State, 770 So. 2d 1119, 1128 (Fla. 2000)). "[I]t is the objection/re-objection process . . . that is the decisive element in a juror-objection-preservation analysis," Matarranz, 133 So. 3d at 482, because "[b]y not renewing the objection prior to the jury being sworn, it is presumed that the objecting party abandoned any prior objection he or she may have had and was satisfied with the selected jury," Carratelli v. State, 961 So. 2d 312, 318 (Fla. 2007) (quoting Zack v. State, 911 So. 2d 1190, 1204 (Fla. 2005)).

Cozzie satisfied Matarranz's objection/reobjection rule. Defense counsel moved to strike prospective jurors Neece and Bishop-Avery for cause, arguing

- 14 -

they had indicated that, if their findings regarding the aggravating and mitigating circumstances permitted a death recommendation, they would not still be willing to consider recommending life. The trial court denied the request, and defense counsel used peremptory challenges to strike them. After defense counsel exhausted all of his peremptory challenges, he requested additional peremptory challenges and in so doing reminded the trial court that he had used three peremptory challenges to strike prospective jurors as a result of the rulings denying his cause challenges. Defense counsel further identified the prospective jurors he would have excused if granted additional peremptory challenges. The trial court denied counsel's request for additional peremptory challenges and seated as the eleventh and twelfth jurors the two prospective jurors that defense counsel identified as the jurors he would have excused. Further, just prior to the jury being sworn, defense counsel "acknowledge[d] this is the jury that we selected . . . subject to the objections that we made previously." Accordingly, defense counsel preserved this issue. See Matarranz, 133 So. 3d at 483.

"Given that the requirements of preservation were satisfied, [Cozzie] would suffer a violation of his due process rights if [prospective jurors Neece and Bishop-Avery] should have been, but [were] not, removed for cause." Id. As this Court has explained, "[t]he question of the competency of a challenged juror is 'one of mixed law and fact to be determined by the trial judge in his [or her] discretion.

- 15 -

This decision will not be disturbed unless error is manifest.' " Id. at 484 (quoting

Singer v. State, 109 So. 2d 7, 22 (Fla. 1959)). This Court has further "articulated

the applicable rule to evaluate whether a trial court's denial of a challenge for

cause constitutes reversible error":

> [I]f there is basis for any reasonable doubt as to any juror's possessing
> that state of mind which will enable him to render an impartial verdict
> based solely on the evidence submitted and the law announced at the
> trial, he should be excused on motion of a party, or by the court on its
> own motion.

Matarranz, 133 So. 3d at 484 (quoting Singer, 109 So. 2d at 23-24).

Cozzie argues that prospective jurors Neece and Bishop-Avery's answers

show they were mitigation- and life-impaired. Specifically, Cozzie takes issue

with their responses that, if their findings regarding the aggravating and mitigating

circumstances permitted a death recommendation, they would not be willing to

consider recommending life, even though they would still have the authority to do

so under the law as codified in the standard jury instruction governing the

recommended sentence in a capital case.[6]

_____

6. This instruction provides:

> The sentence that you recommend must be based upon the facts
> as you find them from the evidence and the law. If, after weighing the
> aggravating and mitigating circumstances, you determine that at least
> one aggravating circumstance is found to exist and that the mitigating
> circumstances do not outweigh the aggravating circumstances, or, in
> the absence of mitigating factors, that the aggravating factors alone
> are sufficient, you may recommend that a sentence of death be

- 16 -

We agree with the trial court's ruling that prospective jurors Neece and Bishop-Avery's answers did not require their excusal for cause. Nothing in their answers indicated that they would not follow the law. To the contrary, considered in their entirety, the answers each of these prospective jurors gave during voir dire indicate that they would not have impermissibly recommended death based solely on a first-degree murder conviction, that they would have considered mitigation, including mental health mitigation, and that they would have made a recommendation based upon their findings regarding the aggravating and mitigating circumstances, with the understanding that they were never required to recommend death. These answers do not provide a "basis for any reasonable doubt [that prospective jurors Neece and Bishop-Avery] possess[ed] that state of mind which [would have] enable[d] [them] to render an impartial verdict based solely on the evidence submitted and the law announced at the trial." Matarranz, 133 So. 3d

---

imposed rather than a sentence of life in prison without the possibility of parole. Regardless of your findings in this respect, however, you are neither compelled nor required to recommend a sentence of death. If, on the other hand, you determine that no aggravating circumstances are found to exist, or that the mitigating circumstances outweigh the aggravating circumstances, or, in the absence of mitigating factors, that the aggravating factors alone are not sufficient, you must recommend imposition of a sentence of life in prison without the possibility of parole rather than a sentence of death.

Fla. Std. Jury Instr. (Crim.) 7.11 Penalty Proceedings – Capital Cases (2014) (emphasis added).

at 484 (quoting Singer, 109 So. 2d at 23-24). Accordingly, the trial court did not err in denying Cozzie's cause challenges to these prospective jurors.

## 2. Rebuttal Testimony of State's Mental Health Expert

Cozzie next argues that the trial court abused its discretion in admitting the rebuttal testimony of the State's mental health expert, Dr. Harry McClaren, because it exceeded the proper scope of rebuttal. Specifically, Cozzie argues that the State improperly used Dr. McClaren to introduce evidence of the CCP, HAC, and avoid arrest aggravators and evidence of lack of remorse as improper nonstatutory aggravation. The trial court did not err.

Cozzie made his mental health an issue in the case, arguing, among other things, that he lacked the ability to conform his conduct to the requirements of the law and had cognitive deficits. In support of this argument, Cozzie's mental health experts, Drs. Gold and Zieman, testified to numerous mental health issues, including Cozzie's difficulty understanding social cues, brain deficits, PTSD, dissociative reactions, inability to exercise executive control over his actions, and inability to engage in a multi-step plan.

"[O]n cross-examination[,] the prosecution naturally attempted to establish whether any of [Cozzie's] mental infirmities were related to his actions on the [day Courtney] was killed." Abdool v. State, 53 So. 3d 208, 221 (Fla. 2010). In response to the State's questioning, Dr. Gold testified that "it's possible" Cozzie's

- 18 -

"compromised functioning, his dissociative or psychotic experiences may have negatively impacted his ability" to conform his conduct to the requirements of the law at the time of the crimes. Dr. Gold explained that Cozzie told him that the victim made a comment which Cozzie "interpreted as indicating that he was a creep and the next thing he knew he came to finding that he was choking her."

To rebut the testimony of Cozzie's mental health experts, the State was entitled to present testimony from its own mental health expert, Dr. McClaren. Moreover, it was within the proper scope of rebuttal for Dr. McClaren to testify as to why he reached a contrary opinion from Cozzie's mental health experts— including Cozzie's description of actions like "the strangling with the shirt, dragging away, covering up, [and g]oing to get help" that showed Cozzie did not lose control of his executive functioning and had ability to have executive thoughts and carry out those thoughts. See Davis v. State, 698 So. 2d 1182, 1191 (Fla. 1997) ("[I]t would be unfair to permit a defendant to present mitigating mental health evidence at the penalty phase while denying the State the opportunity to present evidence on the same issue."); see generally Rimmer v. State, 825 So. 2d 304, 321 (Fla. 2002) ("Generally, rebuttal testimony is permitted to refute a defense theory or to impeach a defense witness.").

Similarly, the State was entitled to have Dr. McClaren explain the factual basis for his diagnosis of antisocial personality disorder, a diagnosis that Cozzie's

own expert, Dr. Gold, specifically rejected. Within this context, it was proper for Dr. McClaren to testify that Cozzie satisfied the diagnostic criteria for antisocial personality disorder, including demonstrating a lack of remorse, especially since the trial court instructed the State to limit its questioning on Cozzie's lack of remorse to the antisocial personality diagnosis. See Abdool, 53 So. 3d at 221 (finding expert testimony regarding the defendant's lack of remorse within the context of discussing the characteristics of antisocial personality disorder was not error).

Moreover, it was not improper for Dr. McClaren to explain how statements that Cozzie made to him and allegedly made to third parties impacted his diagnosis. See § 921.141(1), Fla. Stat. (allowing the introduction of evidence during the penalty phase that the court deems probative to the penalty phase issues "regardless of its admissibility under the exclusionary rules of evidence, provided the defendant is accorded a fair opportunity to rebut any hearsay statements"); see also § 90.803(18), Fla. Stat. (listing the admission of a party opponent as an exception to the hearsay rule).

Because Dr. McClaren's testimony did not exceed the proper scope of rebuttal, the trial court did not abuse its discretion in admitting it.

### 3. Avoid Arrest Aggravator

Cozzie also argues that the trial court erred in finding the avoid arrest aggravator. As Cozzie points out, this aggravator was not submitted to the jury but was nevertheless found by the trial court. In an analogous case, we found the same action by a trial court harmless, "[w]ithout addressing the trial court's conclusion that the aggravator of commission to avoid arrest was proven beyond a reasonable doubt, or whether the aggravator could be found even though it was not submitted to the jury." Aguirre-Jarquin v. State, 9 So. 3d 593, 608 (Fla. 2009). We take the same approach here.

Even if the avoid arrest aggravator were stricken in Cozzie's case, the unanimous death recommendation would still remain, along with the aggravators of CCP, HAC, and in the course of a felony, which are among the weightiest aggravators in our capital sentencing scheme and were assigned great weight by the trial court. Therefore, as we held in Aguirre-Jarquin, a case involving a nine-to-three jury recommendation and the aggravating circumstances of prior violent felony, in the commission of a burglary, HAC, and victim vulnerability, "any possible error was harmless because there was not a reasonable possibility that [Cozzie] would have received a life sentence without the trial court finding of the [avoid arrest] aggravator." Id.[7]

---

7. Because we do not address whether the trial court erred in finding the avoid arrest aggravator, it is unnecessary to address Cozzie's argument that the

## 4. State's Penalty Phase Evidence

Cozzie next argues that the trial court erred by allowing the State's penalty phase evidence to become an improper feature of the penalty phase. Specifically, Cozzie takes issue with the trial court's treatment of the following evidence presented by the State: (a) victim impact evidence; and (b) collateral crime evidence that, a week prior to the victim's murder, Cozzie attacked a 14-year-old girl on the same nature trail where the victim was murdered. The trial court did not err.

### (a) Victim Impact Evidence

Cozzie argues that the trial court failed to properly limit the State's victim impact evidence such that it became a prejudicial feature of the penalty phase, violating his rights to due process and denying him a fair penalty phase. We disagree.

As this Court has explained,

> [i]n Payne v. Tennessee, 501 U.S. 808, 827 (1991), the United States Supreme Court held that the Eighth Amendment to the United States Constitution did not prevent the State from presenting evidence about the victim, evidence of the impact of the murder on the victim's family, and prosecutorial argument on these subjects, if permitted to do so by state law. Subsequently, the Florida Legislature enacted section 921.141(7), which permits the prosecution to introduce and argue victim impact evidence. See ch. 92-81, § 1, Laws of Fla. Even

_____

trial court improperly relied upon testimony of the State's mental health expert to support this finding.

though victim impact evidence is admissible in a death penalty case, it is limited to evidence "designed to demonstrate the victim's uniqueness as an individual human being and the resultant loss to the community's members by the victim's death." § 921.141(7), Fla. Stat. (2005). "Characterizations and opinions about the crime, the defendant, and the appropriate sentence shall not be permitted as a part of victim impact evidence." Id.; see also Payne, 501 U.S. at 830 n.2. Additionally, the Florida Constitution contains a victims' rights provision that entitles the victims of crimes, including the next of kin of homicide victims, "to the right to be informed, to be present, and to be heard when relevant, at all crucial stages of criminal proceedings, to the extent that these rights do not interfere with the constitutional rights of the accused." Art. I, § 16, Fla. Const.

Franklin v. State, 965 So. 2d 79, 97 (Fla. 2007).

This Court has recognized that "[e]vidence of . . . grief and suffering due to the loss of the victim is evidence of 'the resultant loss to the community's members by the victim's death' " and therefore admissible victim impact evidence. Victorino v. State, 127 So. 3d 478, 496 (Fla. 2013). Further, this Court has "consistently upheld three" victim impact witnesses, Deparvine v. State, 995 So. 2d 351, 378 (Fla. 2008), and affirmed the presentation of numerous photographs, see Wheeler v. State, 4 So. 3d 599, 608 (Fla. 2009) (holding trial court did not err in allowing the State to present 54 victim and family photographs).

Courtney was a 15-year-old girl who was loved by many and involved in numerous church, school, and community activities in her tight-knit community. Because of the family- and community-oriented life Courtney led, her death impacted many. To demonstrate Courtney's uniqueness as an individual human

- 23 -

being and the resultant loss to the community's members caused by her death, the State presented three victim impact witnesses—the victim's mother, father, and godfather (in that order). Through these witnesses, the State presented several (28) photographs, which depicted the victim with her family and friends and the ways in which the community came together to remember the victim, as well as a program from the victim's funeral and a poem the victim's sister read at the funeral.[8]

Near the end of the mother's (approximately 50-minute and 30-page long) testimony (which focused on the effect the victim's loss had on her, her immediate family, the victim's friends, and the community of which the victim was an active part), Cozzie objected and asked the trial court to limit further victim impact evidence. The trial court overruled the objection, but instructed the State not to use its remaining witnesses to present cumulative testimony. The State complied and presented different evidence through the father (whose testimony focused on the impact of the victim's loss on him and his extended family) and godfather (whose testimony focused on the impact to him, his family (who are not related to the

_____

8. Cozzie did not specifically object to the introduction of any of this evidence below, nor does he argue on appeal that any specific piece of evidence was improperly introduced. Rather, he focuses on the cumulative effect of the evidence.

victim's family), and the church community); and their testimony was much shorter in length (approximately 14 and 8 pages long, respectively).

At other points during the State's presentation, Cozzie objected, arguing that, cumulatively, the probative value of the victim impact evidence was outweighed by the danger of unfair prejudice and that the evidence presented was so prejudicial as to violate his right to due process, and Cozzie also moved for a mistrial after each witness's testimony. The trial court overruled Cozzie's objections and denied his motions for a mistrial.

The only victim impact evidence to which Cozzie raised a contemporaneous objection below was testimony about the immediate family's feelings when they realized the victim was lost. This is not improper victim impact evidence, especially since Cozzie was convicted of the victim's contemporaneous kidnapping, and the challenged testimony discussed feelings during the search before the immediate family knew the victim had also been murdered. See Victorino, 127 So. 3d at 496. Though Cozzie also objected below to the amount of the victim impact evidence and its cumulative prejudicial effect under section 90.403, Florida Statutes, the record shows that, to address Cozzie's concerns, the trial court specifically limited the State to presenting proper, nonrepetitive victim impact evidence through different witnesses. We find no abuse of discretion. See Murray v. State, 3 So. 3d 1108, 1124 (Fla. 2009) ("Once the trial court has

- 25 -

weighed the evidence to determine whether its value was more probative than prejudicial, this Court will not overturn its decision absent an abuse of discretion.").

Nor has Cozzie demonstrated that the totality of the victim impact evidence, including that demonstrating the community's expressions of sympathy about which he particularly complains,[9] rises to the level of fundamental error or a due process violation. See McGirth v. State, 48 So. 3d 777, 791-92 (Fla. 2010) (holding that victim impact evidence of "a photograph depicting a balloon release in [the victim's] memory, a photograph of a plaque and [the victim's] retired softball jersey, and a copy of the quarter-page advertisement purchased in [the victim's] memory [was not] impermissibly prejudicial so as to warrant a new penalty phase proceeding"). While we recognize that "the admissibility of victim impact evidence is not limitless," "cannot provide characterizations and opinions about the crime," or "place[] undue focus on victim impact," id. at 791, based on the specific facts of this case, the State's victim impact evidence did not cross any

---

9. This evidence includes testimony and photographs of numerous memorials to Courtney, such as a heavily attended funeral and burial service, business and church marquees memorializing her, a balloon release in her honor, T-shirts in her honor, a restored tractor in her honor, an elementary school library named after her, a football season dedicated to her, retiring her soccer jersey, leaving the valedictorian chair open for her at her high school graduation, white bows and balloons placed around the community for her funeral and again during Cozzie's trial and penalty phase, and scholarships in her honor.

constitutional line. Courtney impacted a great number of people in her short life, and the victim impact evidence presented was a fair summary of her uniqueness as an individual and the loss her death caused to her family and community. Therefore, its admission "neither constituted fundamental error nor violated due process." Id.

**(b) Collateral Crime Evidence**

During the penalty phase, the State introduced, over Cozzie's objection, Williams rule evidence[10] of Cozzie's alleged attack on another girl. Cozzie's alleged attack on this girl, MSB,[11] occurred in the same location as the crimes against the victim in this case, Courtney Wilkes, just one week prior to Courtney's murder, but was not reported to the police until after Courtney was murdered. While Cozzie acknowledges the probative nature of this evidence, he argues that its probative value is substantially outweighed by the danger of unfair prejudice, and that the trial court's failure to limit testimony pertaining to the attack on MSB allowed collateral crime evidence to improperly become a feature of the penalty phase. We disagree.

---

10. Williams v. State, 110 So. 2d 654 (Fla. 1959) (establishing rule governing the admissibility of evidence of other crimes, wrongs, or acts that has since been codified in section 90.404(2)(a), Florida Statutes).

11. Because MSB was 14 years old at the time of the alleged attack, we refer to her by her initials.

This Court has explained that "it is not solely the quantity but also the quality and nature of collateral crimes evidence in relation to the issues to be proven that determines whether its admission has 'transcended the bounds of relevancy to the charge being tried.'" Conde v. State, 860 So. 2d 930, 946 (Fla. 2003) (quoting Williams v. State, 117 So. 2d 473, 475 (Fla. 1960)).

Cozzie's alleged prior attack on MSB could not have been more probative of the penalty phase issues, unless MSB herself had been raped and murdered. The alleged attack on MSB occurred one week prior to the victim's murder and shared many of the same features as Cozzie's attack on the victim, including meeting a vacationing, underage victim outside of her condominium, luring her to the nature trail under the guise of going for a walk, and initiating a surprise strangle attack from behind in an effort to overpower and rape her. Evidence of the alleged attack on MSB rebutted Cozzie's proposed mitigation that his cognitive deficits prevented him from planning or conforming his conduct to the requirements of the law, and it was strong circumstantial evidence of the CCP aggravator, indicating that Cozzie carried out his attack on the victim as part of a plan to rape and murder young females rather than in a dissociative state caused by his PTSD. Cf. Gore v. State, 784 So. 2d 418, 432 & n.9 (Fla. 2001) (listing Gore's "history of targeting young, attractive women who drove new sporty automobiles" among the trial court's "extensive findings in support of the CCP aggravating circumstance").

Additionally, evidence of the alleged attack on MSB rebutted Cozzie's proposed mitigation that he had no significant history of prior criminal activity. See Hildwin v. State, 531 So. 2d 124, 128 (Fla. 1988) ("[D]uring the penalty phase of a capital case, the state may rebut defense evidence of the defendant's nonviolent nature by means of direct evidence of specific acts of violence committed by the defendant provided, however, that in the absence of a conviction for any such acts, the jury shall not be told of any arrests or criminal charges arising therefrom.").

Moreover, the record reflects that the State limited its evidence of the alleged attack on MSB. The four State witnesses who testified after MSB did so as necessary to corroborate that MSB had been attacked and that Cozzie was her attacker in light of challenges to MSB's testimony that Cozzie raised on cross-examination and through a witness Cozzie called to support his argument that MSB's account was not truthful because, according to this witness, MSB told him the attack occurred in a truck rather than on the nature trail. The record also shows that the trial court instructed the jury as to the proper purpose of the collateral crime evidence before each State witness testified, namely that the evidence should be considered "for the limited purpose of intent, preparation, plan, the absence of mistake or accident on the part of the defendant, and/or to rebut any claimed mitigating circumstance to which you find [it] applies." See Conde, 860 So. 2d at 947 (ruling trial court did not abuse its discretion in admitting Williams rule

evidence and "plac[ing] special emphasis on the fact that the trial court repeatedly instructed the jury as to the proper purpose of [the] evidence each time it was introduced").

Accordingly, we conclude that the evidence regarding Cozzie's alleged prior attack on MSB "did not become an impermissible feature of the trial and that the trial court did not abuse its discretion in allowing the evidence ultimately introduced by the State." Id. at 946.[12]

### 5. Hurst Claim

After the United States Supreme Court issued its decision in Hurst v. Florida, 136 S. Ct. 616 (2016), Cozzie filed supplemental briefing, arguing that his death sentence is unconstitutional under Hurst and that his case should be remanded for the imposition of a life sentence. However, because the Hurst error in this case is harmless beyond a reasonable doubt, we affirm Cozzie's death sentence.

We have held that "section 775.082(2), Florida Statutes, does not mandate the imposition of a life sentence in the event of a [Hurst] violation." Knight v. State, 42 Fla. L. Weekly S133, S140 (Fla. Jan. 31, 2017) (citing Hurst v. State, 202

---

12. Cozzie also argues that errors in admitting the victim impact evidence and evidence of his alleged attack on MSB cumulatively denied him a fair and impartial penalty phase. However, because the trial court did not err in admitting this evidence, there is no error to cumulate.

So. 3d 40, 63-66 (Fla. 2016), petition for cert. filed, No. 16-998 (U.S. Feb. 16, 2017)).  Moreover, in Davis v. State, 207 So. 3d 142, 175 (Fla. 2016), petition for cert. filed, No. 16-8569 (U.S. Mar. 30, 2017), this Court emphasized the unanimous recommendations of death and held that the Hurst error was harmless.

What we said in Davis, 207 So. 3d at 175, is also applicable here:

> [T]he jury unanimously found all of the necessary facts for the imposition of death sentences by virtue of its unanimous recommendations.  In fact, although the jury was informed that it was not required to recommend death unanimously, and despite the mitigation presented, the jury still unanimously recommended that [the defendant] be sentenced to death . . . .  The unanimous recommendations here are precisely what we determined in Hurst to be constitutionally necessary to impose a sentence of death.

Accordingly, the Hurst violation in Cozzie's case was harmless beyond a reasonable doubt.  See id.  Therefore, as in Davis, the Hurst violation here does not entitle Cozzie to a new penalty phase.

## 6.  Sufficiency

"[T]his Court has a mandatory obligation to independently review the sufficiency of the evidence in every case in which a sentence of death has been imposed."  Miller v. State, 42 So. 3d 204, 227 (Fla. 2010).  To conduct this review, this Court "view[s] the evidence in the light most favorable to the State to determine whether a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt."  Rodgers v. State, 948 So. 2d 655, 674 (Fla. 2006).  In this case, competent substantial evidence supports

- 31 -

Cozzie's convictions for first-degree premeditated or felony murder with a weapon. See Davis v. State, 2 So. 3d 952, 966-67 (Fla. 2008) ("In appeals where the death penalty has been imposed, this Court independently reviews the record to confirm that the jury's verdict is supported by competent, substantial evidence.").

As explained above, Cozzie was the last person seen with the victim prior to her murder. Cozzie told Michael Spencer that he killed the victim, took him to see her body, and provided Spencer with many details of her murder, some of which Spencer testified that he observed at the scene (e.g., head wounds and physical disturbances to the landscape that were consistent with a struggle). Those details of Cozzie's confession as well as others, including that Cozzie restrained the victim, strangled her with a ligature, and beat her with a piece of wood, were corroborated by the medical examiner and through DNA evidence. Moreover, Cozzie's defense counsel conceded in his guilt-phase closing argument that Cozzie unlawfully killed the victim in an effort to have the jury convict Cozzie of the lesser-included offense of second-degree murder. Accordingly, the evidence is sufficient to support Cozzie's conviction for first-degree premeditated or felony murder with a weapon.

### 7. Proportionality

This Court reviews the proportionality of each death sentence "to determine whether the crime falls within the category of both the most aggravated and the

least mitigated of murders, thereby assuring uniformity in the application of the [death] sentence." Anderson v. State, 841 So. 2d 390, 407-08 (Fla. 2003) (citation omitted). In conducting its proportionality review, this Court does not compare the number of aggravating and mitigating circumstances. Pham v. State, 70 So. 3d 485, 500 (Fla. 2011). Rather, "the Court looks at the totality of the circumstances to determine if death is warranted in comparison to other cases where the sentence of death has been upheld." Id. (quoting England v. State, 940 So. 2d 389, 408 (Fla. 2006)).

Cozzie's case involves the strangulation and beating murder of a 15-year-old girl, whom Cozzie also kidnapped, abused, and sexually battered. His jury recommended death by a vote of 12 to 0. The trial court found four aggravating circumstances beyond a reasonable doubt, all of which it assigned great weight: (1) in the course of a sexual battery, aggravated child abuse, and kidnapping; (2) HAC; (3) CCP; and (4) avoid arrest. In contrast to this weighty aggravation, the trial court found the statutory mitigating circumstance of Cozzie's age at the time of the crime (21 years old), to which it assigned moderate weight, and 25 nonstatutory mitigating circumstances, none of which were assigned more than moderate weight.

Under the totality of the circumstances, Cozzie's death sentence is proportional in relation to other death sentences that this Court has upheld. This

Court has "repeatedly affirmed the death penalty where the defendant has kidnapped, sexually battered, and murdered a child victim." Smith v. State, 28 So. 3d 838, 875 (Fla. 2009) (finding death sentence proportionate where the trial court found the aggravators of (1) committed while on probation (moderate weight); (2) in the commission of a sexual battery or kidnapping (significant weight); (3) avoid arrest (great weight); (4) HAC (great weight); and (5) victim under 12 years of age (great weight), and several nonstatutory mitigating circumstances, including that the defendant had a long and well-documented history of mental illness (moderate weight), repeatedly sought help for his problems (little weight), and had positive qualities (moderate weight)); see also Bryant v. State, 21 So. 3d 1276, 1288 (Fla. 2009) (death sentence proportionate penalty in first-degree murder of an adult victim where the trial court found the aggravators of HAC and in the commission of a sexual battery, both of which were given great weight; the statutory mitigators of no significant history of prior criminal activity (little weight), capacity to appreciate the criminality of conduct or to conform conduct to the requirements of law was substantially impaired (moderate weight), the defendant's age (39 years old) at the time of the offense (little weight); and several nonstatutory mitigating factors, including borderline verbal intelligence (little weight), was not a sociopath or psychopath and did not have antisocial personality disorder (little weight), and symptoms of attention deficit disorder (moderate weight)).

Accordingly, Cozzie's death sentence is proportionate.

## CONCLUSION

For the foregoing reasons, we affirm Cozzie's conviction for first-degree premeditated or felony murder with a weapon and his sentence of death.

It is so ordered.

LABARGA, C.J., and LEWIS, J., concur.
POLSTON, J., concurs with an opinion, in which CANADY and LAWSON, JJ., concur.
PARIENTE, J., concurs in result with an opinion.
CANADY, J., concurs as to the conviction and concurs in result as to the sentence.
QUINCE, J., concurs in part and dissents in part with an opinion.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

POLSTON, J., concurring.

While I concur fully with the rest of the opinion, I do not believe a harmless error analysis is necessary in this case as there is no error under Hurst v. Florida, 136 S. Ct. 616 (2016). See Hurst v. State, 202 So. 3d 40, 81-82 (Fla. 2016) (Canady, J., dissenting), petition for cert. filed, No. 16-998 (U.S. Feb. 13, 2017).

CANADY and LAWSON, JJ., concur.

PARIENTE, J., concurring in result.

I concur in result with the majority's opinion because I believe it was error for the trial court to admit rebuttal testimony regarding Cozzie's lack of remorse during the penalty phase of the trial. The majority states:

Similarly, the State was entitled to have Dr. McClaren explain the factual basis for his diagnosis of antisocial personality disorder, a diagnosis that Cozzie's own expert, Dr. Gold, specifically rejected. Within this context, it was proper for Dr. McClaren to testify that Cozzie satisfied the diagnostic criteria for antisocial personality disorder, including demonstrating a lack of remorse, especially since the trial court instructed the State to limit its questioning on Cozzie's lack of remorse to the antisocial personality diagnosis.

Majority op. at 19-20. However, this statement directly contradicts this Court's opinion in Fletcher v. State, 168 So. 3d 186 (Fla. 2015), where we held that it was error for the trial court to permit the State to question its own expert on the defendant's lack of remorse. Id. at 212. Specifically, in Fletcher we stated:

Here, Fletcher did not open the door to lack of remorse evidence by calling an expert who testified generally that Fletcher suffered from antisocial personality disorder. This Court has repeatedly held that a diagnosis of antisocial personality disorder does not permit this type of testimony. Specifically, in Atwater v. State, 626 So. 2d 1325, 1328 (Fla. 1993), this Court stated that a trial court "err[s] in permitting the State on cross-examination to ask [the defense's expert] whether persons with antisocial personality showed remorse." See also Peterson [v. State], 2 So. 3d [146,] 158 [(Fla. 2009)] (holding that "the State ordinarily may not present evidence or argument about a defendant's lack of remorse in the context of discussing a diagnosis of antisocial personality disorder").

Id. (first two alterations in original) (emphasis added).

Moreover, the majority's reliance on Abdool v. State, 53 So. 3d 208, 221 (Fla. 2010), is misplaced. See majority op. at 18. In Abdool, the defendant did not object to the defense expert's testimony elicited by the State on cross-examination during the penalty phase that Abdool lacked remorse, one of the characteristics of

antisocial personality disorder. 53 So. 3d at 220. Therefore, this Court's inquiry was whether the statement constituted fundamental error. Id. ("Therefore, even if this testimony was error, we must review the claim to establish whether it was so prejudicial as to constitute fundamental error."). Accordingly, in Abdool, this Court subjected the unobjected-to and brief testimony regarding the defendant's lack of remorse to the high burden of whether the error "goes to the foundation of the case or the merits of the cause of action and is equivalent to a denial of due process." Id. (quoting Bailey v. State, 998 So. 2d 545, 554 (Fla. 2008)). Because Cozzie objected to both statements by the defense and State's expert witnesses regarding Cozzie's lack of remorse as it related to his diagnosis of antisocial personality disorder, this case is more akin to the analysis in Fletcher than Abdool.

I concur in result because, although I find that the trial court erred, I would find the error harmless beyond a reasonable doubt. "The harmless error test . . . places the burden on the state, as the beneficiary of the error, to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction." State v. DiGuilio, 491 So. 2d 1129, 1135 (Fla. 1986) (citing Chapman v. California, 386 U.S. 18, 24 (1967)). Importantly, in the instant case, similar to Fletcher, the prosecutor did not argue lack of remorse during closing arguments, nor did he make any other reference to Cozzie's lack of remorse

- 37 -

following the initial statements. See Fletcher, 168 So. 3d at 213. In light of the considerable aggravation in this case, it is clear that there is no reasonable possibility that this error contributed to Cozzie's conviction. Id.; see also Atwater, 626 So. 2d at 1328 (holding that a question as to whether an individual with antisocial personality disorder shows remorse is harmless error).

Finally, as this Court has previously stated, I would "caution the State to take precautions to prevent a reoccurrence of this problem that arises when a defendant permissibly offers a diagnosis of antisocial personality disorder as a mitigating circumstance. . . . [T]his type of evidence in itself does not open the door to the State rebutting the testimony with questions about lack of remorse as a feature of the disorder." Fletcher, 168 So. 3d at 213. For all these reasons, I concur with the majority's result but disagree with its analysis regarding remorse, which is inconsistent with our recent precedent.

QUINCE, J., concurring in part and dissenting in part.

I concur with the majority's finding that the evidence here is sufficient to sustain Cozzie's convictions. However, I cannot agree with the majority's finding that the Hurst error was harmless beyond a reasonable doubt. To the extent that I would not find the error harmless, I dissent.

In Hurst, we held that for a defendant to be eligible for the death sentence, a jury must unanimously find the existence of each aggravating factor, that the

- 38 -

aggravating factors are sufficient, and that the aggravating factors outweigh the mitigating circumstances. Hurst, 202 So. 3d at 44. Additionally, we held that the jury's death sentence recommendation must be unanimous. Id. While I agreed in Hurst that Hurst v. Florida errors are subject to harmless error review, see id. at 68, I do not believe that we can ever find Hurst error harmless when there are aggravating circumstances that require a factual determination based on evidence presented to the jury. Because Hurst "requires a jury, not a judge, to find each fact necessary to impose a sentence of death," see Hurst v. Florida, 136 U.S. 616, 619 (2016), the error cannot be harmless where such a factual determination was not made.

The aggravating circumstances in this case were that the capital murder was: (1) committed in the course of a sexual battery, aggravated child abuse, and kidnapping; (2) especially heinous, atrocious, or cruel, (3) committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification, and (4) committed to avoid arrest. Only one of these aggravators was established by a factual determination by the jury because the jury found Cozzie guilty of the sexual battery, aggravated child abuse, and kidnapping of Courtney Wilkes. However, the remaining aggravators each required factual findings that, under Hurst, must now be considered and weighed by a jury. As we stated in

Hurst, without an interrogatory verdict, we cannot determine which aggravators the jury unanimously found beyond a reasonable doubt. See Hurst, 202 So. 3d at 67.

In Hurst, we declined to speculate why the jurors voted the way they did, yet because here the jury vote was unanimous, the majority is comfortable determining that the Hurst error in this case is harmless beyond a reasonable doubt. Majority op. at 30-31 (citing Davis v. State, 207 So. 3d 142, 175 (Fla. 2016)). Even though the jury unanimously recommended the death penalty, whether the jury unanimously found each aggravating factor remains unknown. Furthermore, it is unclear from the record whether the jury truly did unanimously find that sufficient aggravating circumstances existed.

The harmless error review is not a sufficiency of the evidence test, and the majority's analysis should instead focus on the effect of the error in the trier of fact. State v. DiGuilio, 491 So. 2d 1129, 1139 (Fla. 1986). By substituting the jury's unanimous recommendation for the fact-finding required by Hurst, the majority is engaging in the exact type of conduct the United States Supreme Court cautioned against in Hurst v. Florida. See Hurst v. Florida, 136 S. Ct. 616, 622 (2016). Because the harmless error review is not a sufficiency of the evidence review nor "a device for the appellate court to substitute itself for the trier-of-fact by simply weighing the evidence," DiGuilio, 491 So. 2d at 1138, I conclude that the error here was harmful.

An Appeal from the Circuit Court in and for Walton County,
Kelvin Clyde Wells, Judge - Case No. 662011CF000353CFAXMX

Andy Thomas, Public Defender, and Nada M. Carey, Assistant Public Defender, Second Judicial Circuit, Tallahassee, Florida,

for Appellant

Pamela Jo Bondi, Attorney General, Tallahassee, Florida; and Melissa J. Roca, Assistant Attorney General, Miami, Florida,

for Appellee